ACCEPTED
15-25-00011-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/9/2025 1:42 PM
CHRISTOPHER A. PRINE
CLERK

**15-25-00011-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/9/2025 1:42:29 PM
CHRISTOPHER A. PRINE
Clerk

# In The Fifteenth Court of Appeals
## Austin, Texas

---

**THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM,
THE UNIVERSITY OF TEXAS SYSTEM, AND
THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER,**

*Appellants,*

V.

**GENSETIX, INC.,**

*Appellee.*

---

*On Appeal From the 152nd District Court of Harris County, Texas*

---

## BRIEF OF APPELLANTS

---

David E. Harrell, Jr.
  State Bar No. 00793905
  David.Harrell@troutman.com
Deanna Markowitz Willson
Chris Dove
**TROUTMAN PEPPER LOCKE LLP**
600 Travis St., Suite 2800
Houston, Texas 77002

Terri M. Abernathy
  Assistant Attorney General
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548, Capitol
Austin, TX 78711

**ATTORNEYS FOR APPELLANTS**

**ORAL ARGUMENT REQUESTED**

## Identity of Parties and Counsel

Pursuant to Texas Rule of Appellate Procedure 38.1(a), the following is a complete list to the best of Appellant's knowledge of all parties and related parties to the judgment, and the names and addresses of all counsel for those parties.

| | |
|---|---|
| Appellants: | The Board of Regents of the University of Texas System<br>The University of Texas System<br>The University of Texas M.D. Anderson Cancer Center |
| Appellants' Counsel: | David E. Harrell, Jr.<br>Deanna Markowitz Willson<br>Chris Dove<br>TROUTMAN PEPPER LOCKE LLP<br>600 Travis St., Suite 2800<br>Houston, Texas 77002<br><br>Terri M. Abernathy<br>OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548, Capitol<br>Austin, TX 78711 |
| Appellee: | Gensetix, Inc. |
| Appellee's Counsel: | Ryan Pigg<br>BUZBEE LAW FIRM<br>600 Travis St., Suite 7500<br>Houston, TX 77002<br><br>Cabrach J. Connor<br>Jennifer Tatum Lee<br>CONNOR LEE & SHUMAKER PLLC |

ii

609 Castle Ridge Rd., Suite 450
Austin, TX  78746-5196

# Table of Contents

**Page**

Statement of the Case ................................................................................1

Statement Regarding Oral Argument................................................................3

Statement of Jurisdiction................................................................................4

Issues Presented ................................................................................5

Statement of Facts ................................................................................8

    A.    Factual Background ................................................................10

        1.    Appellee Becomes the Licensee in June 2014..........................10

        2.    Gensetix's Filed Suit in 2017 to Enforce the Patents, which Breached the License...............................................11

        3.    Termination of the License Consistent with its Terms..........15

    B.    Procedural Background................................................................17

Standard of Review................................................................................19

Summary of the Argument................................................................21

Argument ................................................................................23

    I.    Sovereign immunity defeats Gensetix's breach of contract claim................................................................23

        A.    Appellants are state entities entitled to assert sovereign immunity. ................................................................23

        B.    Sovereign immunity shields UT from lawsuits asserting breach of contract. ................................................................25

        C.    UT cannot waive sovereign immunity "by conduct." ...............27

            1.    The Texas Supreme Court opened the door a tiny crack, and then tried to shut it again....................................29

            2.    Courts of Appeals briefly considered the issue unresolved, and the First Court of Appeals issued *State Street.* ................................................................32

3.    The Texas Supreme Court categorically rejected the theory that sovereign immunity can be "waived by conduct." ...................................................................36

4.    Conclusion: Waiver-By-Conduct is not a Valid Theory for Defeating Sovereign Immunity ...........................................41

D.    At any rate, the facts of this case do not rise to the level of *State Street.* ..................................................................42

E.    This Court should not abrogate sovereign immunity altogether. .................................................................................46

F.    Conclusion: This Court should reverse and render judgment granting the plea to the jurisdiction. ...........................48

II.    This Court must reverse because Gensetix did not plead a valid "takings" claim. ..............................................................48

A.    UT may demonstrate its lack of intent through a plea to the jurisdiction. .............................................................................49

B.    State entities lack "intent" to take property when they act pursuant to a contract. ..................................................................50

C.    Appellants acted pursuant to contract, and thus lacked intent. ..........................................................................................54

D.    Gensetix failed to plead other necessary elements of a takings claim. ...................................................................................57

1.    The License did not create a "vested property right" that can support a takings claim. ...........................................57

2.    Gensetix did not plead that the State acquired the property through "physical" or "regulatory" means. ...........62

3.    Gensetix has not alleged a "public use." ...............................64

Conclusion and Prayer ..........................................................................65

Certificate of Compliance .....................................................................67

Certificate of Service .............................................................................67

Appendix .................................................................................................68

# Index of Authorities

**Page(s)**

**Cases**

*Alternatives Unlimited, Inc. v. Raymondville ISD*,
No. 13-13-00363-CV, 2014 WL 3737973 (Tex. App.—Corpus
Christi-Edinburg Mar. 20, 2014, no pet.) ......................................................39

*Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019)................................................................45

*Burns v. City of San Antonio*,
No. 15-24-00009-CV, 2025 WL 996377 (Tex. App.—15th Dist.
Apr. 3, 2025, reh'g denied, no pet. h.) .........................................................48

*Catalina Development, Inc. v. County of El Paso*,
121 S.W.3d 704 (Tex. 2003)...............................................32, 33, 34, 35

*Christy, Inc. v. United States*,
141 Fed. Cl. 641 (Fed. Cl. 2019)................................................60, 63

*City of Conroe v. TPProperty, LLC*,
480 S.W.3d 545 (Tex. App.—Beaumont 2015, no pet.) ...............................39

*City of Dallas v. Jennings*,
142 S.W.3d 310 (Tex. 2004)................................................................49

*City of Freeport v. Briarwood Holdings, LLC*,
No. 01-11-01108-CV, 2013 WL 1135676 (Tex. App.—Houston
[1st Dist.] Mar. 19, 2013, no pet.).................................................................39

*City of Houston v. Carlson*,
451 S.W.3d 828 (Tex. 2014)................................................................50

*City of Midland v. O'Bryant*,
18 S.W.3d 209 (Tex. 2000)................................................................45

*City of San Antonio v. Polanco & Co., LLC,*
No. 04-07-00258-CV, 2007 WL 3171360 (Tex. App.—San
Antonio Oct. 31, 2007, pet. denied) ..........................................................51, 55

*City of San Antonio v. Pollock,*
284 S.W.3d 809 (Tex. 2009)...................................................................................49

*City of Weslaco v. De Leon,*
No. 13-20-00561-CV, 2022 WL 3652501 (Tex. App.—Corpus
Christi-Edinburg Aug. 25, 2022, pet. denied) ..............................................53

*Cypress Forest Pub. Utility Dist. v. Kleinwood Mun. Utility Dist.,*
309 S.W.3d 667 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ............61

*Dallas County Comm. College Dist. v. Clear Channel Outdoor, Inc.,*
No. 05-07-00701-CV, 2008 WL 3307085 (Tex. App.—Dallas
July 31, 2008, pet. denied) ...................................................................................52

*Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC,*
565 S.W.3d 69 (Tex. App.—Dallas 2017), *aff'd & rev'd on other
grounds*, 576 S.W.3d 362 (Tex. 2019) ...............................................................38

*English v. Fischer,*
660 S.W.2d 521 (Tex. 1983)...................................................................................45

*Enriquez v. Univ. of Texas System Bd. of Regents,*
No. 03-22-00295-CV, 2024 WL 2787274 (Tex. App.—Austin
May 31, 2024, no pet.) ...........................................................................................24

*ETC Marketing, Ltd. v. Harris County Appraisal Dist.,*
528 S.W.3d 70 (Tex. 2017) (Brown, J., concurring) .....................................63

*Federal Sign v. Tex. S. Univ.,*
951 S.W.2d 401 (Tex. 1997).............................................................................*passim*

*Flowers v. Flowers,*
407 S.W.3d 452 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ............20

*General Services Com'n v. Little-Tex Insulation Co., Inc.,*
39 S.W.3d 591 (Tex. 2001).............................................................................*passim*

*Gensetix, Inc. v. Baylor College of Medicine*,
   616 S.W.3d 630 (Tex. App.—Houston [14th Dist.] 2020, pet.
   dism'd) ...................................................................................................14

*Gensetix, Inc. v. Baylor College of Medicine, et al.*,
   354 F. Supp. 3d 759 (S.D. Tex. 2018) ......................................*passim*

*Gensetix, Inc. v. Bd. of Regents of Univ. of Texas System*,
   966 F.3d 1316 (Fed. Cir. 2020)...................................................*passim*

*Green Int'l, Inc. v. State*,
   877 S.W.2d 428 (Tex. App.—Austin 1994, writ dism'd by agr.) ...............51

*Harris County Fresh Water Supply Dist. No. 61 v. Magellan Pipeline Co., L.P.*,
   649 S.W.3d 630 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) ........39

*Hearts Bluff Game Ranch, Inc. v. State*,
   381 S.W.3d 468 (Tex. 2012)...................................................................63

*Horne v. Dep't of Agriculture*,
   576 U.S. 350 (2015)...............................................................................60

*Hosner v. De Young*,
   1 Tex. 764 (1847) ...................................................................................47

*Hughes v. Tom Green County*,
   553 S.W.3d 1 (Tex. App.—Austin 2017), *rev'd on other
   grounds*, 573 S.W.3d 212 (Tex. 2019) .................................................38

*Jefferson County v. Stines*,
   523 S.W.3d 691 (Tex. App.—Beaumont 2017), *rev'd on other
   grounds*, 550 S.W.3d 178 (Tex. 2018) .................................................39

*Jim Olive Photography v. Univ. of Houston Sys.*,
   624 S.W.3d 764 (Tex. 2021)...................................................................61

*Kensington Title-Nevada, LLC v. Tex. Dep't of State Health Servs.*,
   No. 23-0644, 2025 WL 937478 (Tex. 2025).........................................47

*Labrado v. Univ. of Texas at El Paso*,
  2012 WL 43385 (Tex. App.—Austin Jan. 5, 2012, no pet.)..........................39

*Leach v. Texas Tech Univ.*,
  335 S.W.3d 386 (Tex. App.—Amarillo 2011, pet. denied)....................35, 52

*Loram Maint. of Way, Inc. v. Ianni*,
  210 S.W.3d 593 (Tex. 2006)..................................................................28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)..............................................................................61

*Lowe v. Texas Tech Univ.*,
  540 S.W.2d 297 (Tex. 1976)..................................................................23

*M.D. Anderson Cancer Center v. Wang*,
  No. 01-23-00911-CV, 2024 WL 2853698 (Tex. App.—Houston
  [1st Dist.] June 6, 2024, no pet.)......................................................2, 23

*Mayhew v. Town of Sunnyvale*,
  964 S.W.2d 922 (Tex. 1998)...........................................................50, 62

*MBP Corp. v. Bd. of Trustees of Galveston Wharves*,
  297 S.W.3d 483 (Tex. App.—Houston [14th Dist.] 2009, no pet.) .............53

*Mitschke v. Borromeo*,
  645 S.W.3d 251 (Tex. 2022)...........................................................28, 48

*Oncor Elec. Delivery Co. NTU, LLC v. Wilbarger County Appraisal
  Dist.*,
  691 S.W.3d 890 (Tex. 2024)...........................................................40, 41

*Pepper Lawson Horizon Int'l Group, LLC v. Tex. S. Univ.*,
  669 S.W.3d 205 (Tex. 2023)...........................................................23, 26

*Rice v. Rice*,
  533 S.W.3d 58 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ...............28

*Rudison v. MD Anderson Cancer Center*,
  91 F.4th 788 (5th Cir. 2024).................................................................24

*San Jacinto River Auth. v. Medina*,
627 S.W.3d 618 (Tex. 2021)...................................................................62, 63, 64

*Sci. Spectrum, Inc. v. Martinez*,
941 S.W.2d 910 (Tex. 1997)...................................................................21

*Scott v. Alphonso Crutch LSC Charter Sch., Inc.*,
392 S.W.3d 165 (Tex. App.—Austin 2010, pet. denied).............................58

*Seureau v. ExxonMobil Corp.*,
274 S.W.3d 206 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied) ......................................................................................................33

*Sharyland Water Supply Corp. v. City of Alton*,
354 S.W.3d 407 (Tex. 2011)...............................................................*passim*

*Smith v. Lutz*,
149 S.W.3d 752 (Tex. App.—Austin 2004, no pet.) .........................33, 52, 55

*State v. Holland*,
221 S.W.3d 639 (Tex. 2007)...............................................................51, 52, 55

*State/Operating Contractors ABS Emissions, Inc. v. Operating
Contractors/State*,
985 S.W.2d 646 (Tex. App.—Austin 1999, pet. denied)............................61

*Tarrant Reg'l Water Dist. v. Gragg*,
151 S.W.3d 546 (Tex. 2004)...............................................................62, 64

*Texas A&M Univ. Sys. v. Koseoglu*,
233 S.W.3d 835 (Tex. 2007)...............................................................34, 35

*Texas Dep't of State Health Servs. v. Crown Distrib. LLC*,
647 S.W.3d 648 (Tex. 2022)...............................................................57

*Texas Dep't of Transp. v. Self*,
690 S.W.3d 12 (Tex. 2024)...............................................................49, 50, 51, 57

*Texas Dept. of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004)...............................................................*passim*

*Texas Natural Resource Com'n v. IT-Davy*,
  74 S.W.3d 849 (Tex. 2002)...................................................*passim*

*Texas Parks & Wildlife Dept. v RW Trophy Ranch, Ltd.*,
  No. 15-24-1074467, 2025 WL 1074467 (Tex. App.—15th Dist.
  Apr. 10, 2025, no pet. h.)....................................................58

*Texas S. Univ. v. State Street Bank*,
  212 S.W.3d 893 (Tex. App.—Houston [1st Dist.] 2007, pet.
  denied) .........................................................................*passim*

*Texas Southern Univ. v. Villareal*,
  620 S.W.3d 899 (Tex. 2021)...............................................23

*Texas Tech Univ. System v. Martinez*,
  691 S.W.3d 415 (Tex. 2024)...........................................20, 44

*TGP Public Schools, Inc. v. Powell Law Group, LLP*,
  No. 03-22-00200-CV, 2024 WL 1333991 (Tex. App.—Austin
  May 29, 2024, no pet.) .......................................................38

*TXU Energy Retail Co. L.L.C. v. Fort Bend ISD*,
  472 S.W.3d 462 (Tex. App.—Dallas 2015, no pet.) ......................39

*W.W. Webber, L.L.C. v. Harris County Toll Road Auth.*,
  324 S.W.3d 877 (Tex. App.—Houston [14th Dist.] 2010, no
  pet.)..............................................................................35

*Wichita Falls State Hospital v. Taylor*,
  106 S.W.3d 692 (Tex. 2003)...............................................47

*Willacy County Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*,
  555 S.W.3d 29 (Tex. 2018).................................................40

**Statutes and Constitution**

Tex. Civ. Prac. & Rem. Code § 51.014 ...................................4

Tex. Civ. Prac. & Rem. Code § 107 ..................................24, 26

Tex. Civ. Prac. & Rem. Code § 114.003 .................................26

Tex. Const. Art. I, § 17 .............................................................48, 61, 63

Tex. Educ. Code § 61.003.............................................................23, 24, 25

Tex. Educ. Code § 65.02.........................................................................23

Tex. Educ. Code § 65.11.....................................................................23, 25

Tex. Educ. Code § 73.001...................................................................23, 25

Tex. Gov't Code § 441.101.................................................................23, 24

Tex. Gov't Code § 572.002......................................................................23

Tex. Local Gov't Code § 271.152 .........................................................26, 36

## Statement of the Case

*Nature of the Case*　In November 2021, Gensetix sued Appellants, which are state entities, alleging that their decision to terminate a patent license agreement deprived Gensetix of its right to profitably sub-license that patent to a buyer. CR:9; CR:95. Gensetix alleged breach of contract and a constitutional "taking." CR:105-07.

*Course of Proceedings*　In December 2021, Appellants filed a plea to the jurisdiction asserting sovereign immunity to the breach-of-contract claim and that the "taking" claim must be dismissed because Appellants acted pursuant to contract, among other things. CR:25; CR:131. Gensetix responded, and Appellants replied. CR:400; CR:688. The trial court held a hearing on the motion in March 2022. *See* RR.

*Trial court disposition*　In January 2025—almost three years later, and after his term of office expired—the trial judge issued an order denying the plea to the jurisdiction without explanation. CR:771. Appellants filed this interlocutory appeal. CR:775.

1

## Chart of Party Abbreviations

"Gensetix" means Plaintiff/Appellee Gensetix, Inc. It does not refer to the company "Gensetix, LLC," which was a previous holder of the patent license at issue in this case.

"Board of Regents" means Defendant/Appellant The Board of Regents of The University of Texas System.

"UT System" means Defendant/Appellant The University of Texas System.

"M.D. Anderson" means Defendant/Appellant The University of Texas M.D. Anderson Cancer Center.

"UT" means the Appellants collectively: the Board of Regents, UT System, and M.D. Anderson.

**Statement Regarding Oral Argument**

Appellants ("UT") request oral argument for four reasons:

1.      UT urges this Court to grant oral argument so this Court can give this case the attention it merits, in contrast to the trial court. The trial court fell silent and let UT's plea to the jurisdiction languish for almost three years. Two weeks *after* the judge left office, having lost his party's primary election months earlier, he signed a terse order denying the plea without explanation, reasoning, or citations. Apparently, he was briefly appointed as a visiting judge to clear the backlog on his docket, without notice to the parties. This series of unfortunate events left UT with an understandable concern that the trial judge did not pay sufficient attention to the important issues UT presented. Oral argument will help counter the trial court's failure to show it had meaningfully considered the arguments.

2.      UT's first "issue presented" pertains to the now-outdated notion that a state entity can waive sovereign immunity "by conduct"—an issue of tremendous importance to Texas state agencies. Appellee Gensetix insisted that the trial court in Harris County was bound to follow a single First Court of Appeals case from 2007 instead of newer rulings from the Texas Supreme Court and courts of appeals that contradict the First Court's opinion. Oral

3

argument will help this Court ascertain the current state of the law, free from the false constraints urged by Gensetix.

3.     In the second "issue presented," UT asks this Court to affirm well-established legal precedent that prevents plaintiffs from recharacterizing their breach-of-contract claims as a "taking" claim to defeat sovereign immunity. Here too, oral argument will help this Court ascertain the nature of the pleadings along with the current state of the law on this critical rule.

4.     In its trial court pleadings, Gensetix described the facts in dramatic fashion to portray its standard breach-of-contract allegation as an "extraordinary" case that might allow the trial court to deviate from settled law. Oral argument will help this Court to pierce the pleadings and bluster and apply the standard of review, free from overheated rhetoric.

## Statement of Jurisdiction

This Court has jurisdiction over this interlocutory appeal through TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8), because this is an appeal from an order denying a plea to the jurisdiction filed by "governmental units." All three Appellants satisfy this standard.

4

## Issues Presented

1.     Gensetix asserted a breach-of-contract claim against state entities, and does not claim to have complied with procedures to obtain Legislative approval to sue. It insisted the trial court was bound to follow a single 2007 First Court of Appeals decision holding that, under the "extraordinary factual circumstances" of that case, the state entity had somehow waived sovereign immunity by conduct. Gensetix also insisted the courts should "curtail or abolish" the doctrine of sovereign immunity altogether.

> *Did the trial court err by denying UT's plea to the jurisdiction on Gensetix's breach-of-contract claim?*
>
> *Can a state entity ever waive sovereign immunity by "conduct"? If so, do the facts of this case rise to the level that would allow that doctrine to be recognized?*
>
> *Should this Court abolish sovereign immunity?*

2.     Gensetix also asserted a constitutional "taking" claim, though the property alleged to be "taken" was a license to use patents owned by UT— a license that UT properly terminated under its express contractual authority to do so. Gensetix's alleged "damages" are no different from the alleged benefit of its bargain under the contract, though "taking" claims use a different label.

*Did the trial court err by denying UT's plea to the jurisdiction on Gensetix's constitutional takings claim?*

*Did Gensetix adequately allege that UT acted with intent to take property for public use, as opposed to acting under the contract?*

*Did Gensetix adequately allege the other elements of a constitutional takings claim?*

TO THE HONORABLE FIFTEENTH COURT OF APPEALS:

This dispute about the alleged breach of a patent license agreement presents issues vital to the State of Texas:

- To avoid UT's well-settled right to assert sovereign immunity, Gensetix insisted the trial court had no choice but to follow a single, outlying case from the First Court of Appeals in 2007—the *only* case to ever find that sovereign immunity can be waived "by conduct." In 2011, the Texas Supreme Court categorically rejected that notion because waiver-by-conduct undermines the State's sovereign right to avoid being sued in the first place.

- Gensetix also pleaded a constitutional "takings" claim to try to avoid sovereign immunity, but a long line of Texas cases defeat its scheme. State entities lack the "intent" necessary for a taking when they exercise their rights under a contract. Indeed, if a party could avoid sovereign immunity by recharacterizing its claim as the "taking" of the fruits of the contract, the defense of immunity would be hollow.

The trial court denied UT's plea to the jurisdiction under circumstances that hardly inspire confidence. The plea languished for almost

7

three years, during which time the trial judge fell silent and then lost his primary election. Two weeks *after* he left office, without the benefit of the transcript of the hearing that occurred years earlier, he denied the plea without explanation.

Fortunately, the standard of review is *de novo*, and this Court can finally give UT's arguments the attention they deserve. This Court should follow settled Texas Supreme Court case law, and reverse and render a new judgment granting the plea to the jurisdiction and dismissing Gensetix's claims.

## Statement of Facts

The foundation of Gensetix's claims, and the source of this dispute, is a contract—specifically, a patent license. Employees of M.D. Anderson invented, and subsequently patented, a method of modifying patients' immune systems to kill cancer cells using doubly loaded dendritic cells.[1] In an effort to develop and commercialize this new technology, the Board of Regents signed a Patent and Technology License Agreement (including all amendments and assignments, the "License"). CR:46-73. UT licenses its

---

[1] These were United States Patent Nos. 8,728,806 and 9,333,248 (the "Patents").

8

intellectual property under a set of detailed rules "intended to serve the public good, promote partnerships with the private sector, encourage innovation, promote the engagement of faculty, staff, and students in research, and foster economic development." UT Regents' Rule 90101.[2]

The License was originally granted on September 8, 2008, to one of the inventors of the pertinent technology, Alex Mirrow. CR:46-73. The License granted the licensee a royalty-bearing, exclusive license to manufacture, have manufactured, use, import, offer to sell and/or sell inventions or discoveries pursuant to two U.S. Patents (the "Licensed Rights"). *Id.* However, UT retained significant rights to use and transfer the Licensed Rights. CR:50 (¶ 3.1); *see also infra* at 59 (discussing these rights in more detail). Thus, UT retained ownership of the Patents but agreed to not enforce its right to exclude the licensee from using the invention. In addition, in exchange for the License, the licensee was required to engage in certain efforts to commercialize the technology, provide periodic reports, and make periodic payments to UT. CR:46-73.

---

[2] *Available at* https://www.utsystem.edu/board-of-regents/rules/90101-intellectual-property.

### A. Factual Background

Gensetix's claims derive from the License; accordingly, the expressly stated refusal to waive sovereign immunity in the License could be the entirety of this Court's analysis of UT's sovereign immunity. CR:70 (¶ 15.4). Nevertheless, three important factual developments occurred between execution of the original License in 2008 and November 2021, when Gensetix filed claims against UT in the instant action. This factual and procedural background provides additional context to UT's plea to the jurisdiction.

### 1. Appellee Becomes the Licensee in June 2014

First, Gensetix did not have any rights under the License until September 2018, which was the culmination of multiple assignments and amendments. On January 13, 2014, pursuant to consent by M.D. Anderson, Mr. Mirrow assigned, and *Gensetix, LLC* assumed, the License as licensee. CR:75-77. Notably, *Gensetix, LLC* is a different entity than Appellee Gensetix, Inc.—the former is a Texas limited liability company and the latter is a Delaware corporation. CR:86.

Next, the parties amended the License. On June 2, 2014, with UT as licensor and Gensetix, LLC as licensee, the parties amended the License to address past-due unpaid amounts, maintenance expenses, and periodic

reports required to be provided by the licensee under the License. CR:79-84.

In addition, the 2014 amendment to the License recognized that Gensetix, LLC may reorganize as a Delaware corporation and transfer the License from Gensetix, LLC to Gensetix, Inc., provided that documentation of the transfer is provided to and subject to approval by M.D. Anderson. CR:83 (¶ 9). And, on June 13, 2014, consistent with the amendment, Gensetix, LLC (as licensee) assigned the License to Appellee Gensetix, Inc. CR:86-88.

### 2. Gensetix's Filed Suit in 2017 to Enforce the Patents, Which Breached the License

In April 2017, Gensetix sued Baylor College of Medicine ("BCM"); a biotechnology development company, Diakonos Research, Ltd. ("Diakonos"); and one of the Patents' inventors, William Decker ("Decker"), for allegedly infringing UT's Patents. CR:104; *see also Gensetix, Inc. v. Baylor College of Medicine, et al.*, 354 F. Supp. 3d 759 (S.D. Tex. 2018) (opinion of Judge Hanen dismissing the lawsuit)[3] (the "2017 Federal Suit"). Gensetix attempted to join UT—the owner of the Patents—as an involuntary plaintiff, insofar as federal law deems the patent owner a necessary and indispensable

---

[3] Notably Judge Hanen's order also goes through the procedural history of the 2017 Federal Suit. This Court can also view the documents that support the federal district court's opinion by accessing case 4:17-CV-1025 on PACER. The opinion is Doc. No. 91.

party to a patent infringement action. *Id*. at 763. The 2017 Federal Suit alleged that one of the inventors of the Patents, William Decker, moved from M.D. Anderson to Baylor College of Medicine ("Baylor"), but continued to use the technology covered by the Patents. *Id.* Gensetix further alleged that Decker, Baylor, and Diakonos (collectively, the "Federal Defendants") were all actively using what Gensetix called "extensions" of the Patents[4] without obtaining licenses from Gensetix, and frustrating and delaying Gensetix's ability to commercialize the Patents, including interfering with potential business dealings between Gensetix and Baylor or Diakonos. *Id*.

For many reasons, UT declined to join the lawsuit, invoked its sovereign immunity and filed a motion to dismiss itself from the 2017 Federal Suit. *Id*. at 763-64. On December 10, 2019, the Court granted UT's 12(b)(1) motion and dismissed the case without prejudice. *Id.* at 766. Gensetix appealed to the Federal Circuit, and, on July 24, 2020, the Federal Circuit held that sovereign immunity precludes UT from being joined as an involuntary plaintiff. *Gensetix, Inc. v. Bd. of Regents of Univ. of Texas System*,

---

[4] Gensetix alleged the Federal Defendants' work depended upon and further developed the Patents, and described that work as an "extension" of the Patents in order to conform its rights to the text of the License Agreement.

12

966 F.3d 1316, 1321-24 (Fed. Cir. 2020). However, unlike the district court, the Federal Circuit permitted the case to proceed in UT's absence, thereby giving Gensetix an opportunity to enforce its rights as licensee. *Id.* at 1327.[5]

However, Gensetix had already filed a new lawsuit in state court seeking recovery from the Federal Defendants for the same alleged wrongs asserted in the 2017 Federal Suit. *Gensetix, Inc. v. Baylor College of Medicine, et al.*, Cause No. 2019-02003 in the 129th Judicial District Court of Harris County, Texas (the "2019 State Action"). While the 2019 State Action asserted claims for breach of contract, promissory estoppel, tortious interference, and civil conspiracy, it was based on the same fact pattern laid out in the 2017 Federal Action. *Cf.* Gensetix, Inc.'s Original Petition in the 2019 State Action.[6] On April 17, 2019, Judge Michael Gomez dismissed Gensetix's claims as precluded by the Texas Citizens Participation Act and, on May 29, 2019, awarded each of the Federal Defendants attorneys' fees and sanctions. Gensetix appealed and the Fourteenth Court of Appeals affirmed the

---

[5] The Federal Circuit gave permission for Gensetix's patent suit to go forward without UT because, *inter alia*, "[a]s an exclusive licensee with less than all substantial rights in the patents-in-suit, Gensetix cannot enforce its patent rights without the court allowing the suit to proceed in UT's absence."

[6] Note that all filings related to the 2019 State Action are available from the Harris County District Clerk's website, which provides electronic copies of all documents filed therein.

13

dismissal.[7] In the present case, filed in 2021, Gensetix repeats the same fact pattern as the 2017 Federal Action and 2019 State Action. (CR:95-109.)

The outcomes of the 2017 Federal Suit and the 2019 State Action have three critical implications for Appellants' Plea to the Jurisdiction. First, the Federal Circuit confirmed the very issue that Gensetix is asking this Court to ignore: "Gensetix acknowledges that UT did not waive sovereign immunity" by granting the License. *Id.* at 1323. Second, the federal district court held, and the Federal Circuit confirmed, that the property rights asserted in Gensetix's takings claim are fatally limited in scope: "Gensetix does not challenge the district court's conclusion that, pursuant to the license agreement, UT did not transfer all substantial rights in the [P]atents to Gensetix." *Id.* at 1320 n.4. This holding renders a taking claim an even further stretch because it recognizes that the License did not grant Gensetix substantial rights to the Patents. *Id.*; *see also infra* at 59. Lastly, the dismissal and award of sanctions for the same allegations proffered here render continued allegations of the same futile. The Federal Defendants were awarded repayment of their six-figure attorneys' fees upon dismissal of

---

[7] *See Gensetix, Inc. v. Baylor College of Medicine*, 616 S.W.3d 630 (Tex. App.—Houston [14th Dist.] 2020, pet. dism'd).

these claims, and UT should not be forced to continue expending time and resources on yet another Gensetix-initiated lawsuit when Gensetix has already admitted that UT has sovereign immunity.

### *3. Termination of the License Consistent with its Terms*

While the 2017 Federal Suit was pending in the Federal Circuit, Gensetix breached the License and, pursuant to its terms, UT terminated the License.

Among other obligations, the License required the licensee to pay an Annual Maintenance Fee. CR:93. When Gensetix did not make the requisite payment by the March 1, 2020 deadline, M.D. Anderson provided Gensetix with Written Notice of Termination, which advised Gensetix of its default and gave Gensetix 60 days to cure the default. CR:93-94. Gensetix neither cured nor proffered any arguments that it had not breached or defaulted on the License. So, on May 20, 2020, UT sent Gensetix a Termination Notice, which affirmed the termination of the License.[8] Contrary to Gensetix's

---

[8] UT filed the Notice of Termination in the trial court as Exhibit 7 to Defendants' Answer. This document was inadvertently omitted from the clerk's record. Appellants asked the clerk to file this document in a Second Supplemental Clerk's Record. In the meantime, Exhibit 7 is also included in the Appendix to this Brief.

unsupported aspersions, Gensetix failed to meet its contractual obligations and, when given an opportunity to cure, failed to do so.

Thus, from UT's perspective, UT granted Gensetix a License to develop and commercialize its Patents. Not only did Gensetix not meet developmental milestones, but it tried to pull UT into an unwanted and ill-advised lawsuit, wholly ignoring UT's sovereign immunity. And when Gensetix breached the License and failed to cure after being given the opportunity to do so, UT terminated the License and any rights Gensetix had to the Patents. UT's subsequent sale of the Patents to BCM in 2021, after offering to sell the Patents to Gensetix at the same price, did not violate any of Gensetix's rights in UT's Patents because, at that time, Gensetix had none.

Instead, Gensetix's First Amended Petition presents a (fanciful) narrative reasserting the repeatedly debunked conspiracy between UT and the Federal Defendants. CR:96-99; *see also* Gensetix's Original Petition in the 2019 State Action. In fact, Gensetix's Amended Petition is so similar to the 2017 Federal Lawsuit and the 2019 State Action, portions appear to be copied and pasted paragraph-by-paragraph from those pleadings. Despite the failure of the previous two lawsuits, with four separate courts granting or

16

affirming dismissals (and sanctions in the 2019 State Action),[9] Gensetix has once again tried to peddle the exact same story, with the exact same characters. This lawsuit, filed shortly after the Fourteenth Court of Appeals affirmed dismissal of the 2019 State Action, constitutes another Gensetix attempt to recover something it is not owed. This time, Gensetix goes even further by seeking damages from UT, even though UT has sovereign immunity, just as the federal courts recognized. Gensetix's attempts to plead around that immunity do not change the weight of Texas law on this subject.

## B.    Procedural Background

On November 5, 2021, Gensetix initiated this lawsuit against UT. CR:9. Despite spinning a wild and legally irrelevant tale of a conspiracy between Baylor, Diakonos, and Dr. Decker—remarkably similar to the 2017 Federal Suit and the 2019 State Action —Gensetix sued only UT for breach of contract and takings. Gensetix's Petition alleged that UT "deprived Gensetix of its vested property rights that are conservatively worth at least $100,000,000." CR:9.

---

[9] *See* Orders Granting Sanctions for each of the Federal Defendants issued in the 2019 State Action on May 29, 2019.

Following UT's Answer, Special Exceptions, and Plea to the Jurisdiction filed on December 6, 2021 (CR:25), and Gensetix's First Amended Petition, filed on December 28, 2021 (CR:95), the parties engaged in rapid motions practice, including a First Amended Plea to the Jurisdiction and Special Exceptions (CR:131), a Motion to Dismiss under Rule 91a (which was denied, CR:261) and an eventual agreement to stay discovery and other deadlines until the plea to the jurisdiction was decided. (CR:399, 762, 765.) The trial court heard arguments on UT's Plea to the Jurisdiction and Special Exceptions on March 11, 2022. CR:157; RR.

Almost three years elapsed with no action in the case. Then, on January 14, 2025, Judge Robert Schaffer signed a terse order denying UT's Plea to the Jurisdiction without explanation. CR:771. UT was surprised that Judge Schaffer was the one to sign the order, because he had failed to secure his party's nomination for his seat in the 2024 election, and a different judge took over the 152nd District Court at the beginning of 2025. UT asked the clerk to include in the appellate record any order that explained or justified Judge Schaffer's signature on the order. CR:782. None was included. On further inquiry, the court coordinator of the 152nd District Court informed counsel for UT that Judge Schaffer had been appointed a visiting judge for the

18

purpose of clearing the backlog of cases remaining on his docket when he left office. The parties had not been informed of any such order.

Following the issuance of this long-delayed order, void of any reasoning or explanation, UT timely noticed its interlocutory appeal on February 3, 2025.  CR:775.

<center>**Standard of Review**</center>

The Texas Supreme Court explained the *de novo* standard of review for pleas to the jurisdiction in *Texas Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-27 (Tex. 2004). "Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Id*. at 225-26. Whether a court has subject matter jurisdiction is a question of law." *Id*. "Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo*." *Id*. at 226.

"When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Id*. "We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Id*. However, the Texas Supreme Court later warned that courts "cannot use a

<center>19</center>

liberal construction of the petition as a license to read into the petition a claim that it does not contain." *Texas Tech Univ. System v. Martinez*, 691 S.W.3d 415, 419 (Tex. 2024).[10] "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the parties an opportunity to amend." *Miranda*, 133 S.W.3d at 227.

"However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 227-28. "When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant. We indulge every

---

[10] Quoting *Flowers v. Flowers*, 407 S.W.3d 452, 458 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

20

reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* at 228.[11]

## Summary of the Argument

Gensetix alleges two claims. Sovereign immunity bars the first, and the second is an illegitimate attempt to evade sovereign immunity.

This Court must dismiss Gensetix's breach-of-contract claim because the UT Appellants are state entities with the right to insist on their immunity from suit. Gensetix argued that UT waived immunity through "egregious conduct," relying on a single 2007 case from the First Court of Appeals, *State Street.* More recent cases from the Texas Supreme Court and other courts of appeals have rejected "waiver by conduct," however, because it "would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011).[12] Even if *State Street* remained good law, Gensetix's breach-of-contract allegations in no way resemble the "bait and switch" at issue in that case. Moreover, while Gensetix argued at

---

[11]  Citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

[12]  Quoting *Texas Natural Resource Com'n v. IT-Davy*, 74 S.W.3d 849, 857 (Tex. 2002).

great length that Texas ought to abandon sovereign immunity altogether, this Court should instead follow the several dozen Texas Supreme Court opinions acknowledging that doctrine's existence.

Next, the Court must dismiss Gensetix's constitutional "takings" claim because it is just a breach-of-contract claim dressed in the garb of "takings" to try to evade sovereign immunity. The Texas Supreme Court and courts of appeals have repeatedly held that a state entity lacks the "intent" necessary for a "takings" claim when it exercises its contractual rights, and the same is true here. UT allegedly "took" Gensetix's license to use UT's Patents, by exercising the termination provision in that same license agreement. This is contract law, not eminent domain. For the same reason, Gensetix failed to allege other elements of a takings claim, such as a "vested property right."

Gensetix's true claim is for breach of contract, and it must follow the proper procedures for applying for Legislative permission to file its claim. Meantime, this Court should reverse and render judgment granting the Appellants' plea to the jurisdiction and dismissing Gensetix's claims.

**<u>Argument</u>**

**I.     Sovereign immunity defeats Gensetix's breach of contract claim.**

Sovereign immunity prevents Gensetix from asserting a claim for breach of contract in this lawsuit, and therefore, the trial court erred by denying UT's plea to the jurisdiction. This Court should reject Gensetix's invitations to reopen a door the Texas Supreme Court has now firmly shut.

**A.     Appellants are state entities entitled to assert sovereign immunity.**

Appellants are state institutions of higher learning; therefore, they may assert sovereign immunity. *See* TEX. GOV'T CODE §§ 572.002(10)(B), 441.101(3); TEX. EDUC. CODE §§ 61.003(5), 61.003(6), 61.003(8), 61.003(1o), 65.02(a)(11), 65.11, & 73.001; *see also* CR:135-36. "Sovereign immunity protects various divisions of state government, *including state universities*, from lawsuits for damages unless the Constitution or a legislative enactment waives that immunity." *Pepper Lawson Horizon Int'l Group, LLC v. Texas S. Univ.*, 669 S.W.3d 205, 210 (Tex. 2023) (emphasis added); *see also Texas S. Univ. v. Villareal*, 620 S.W.3d 899, 904 (Tex. 2021); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976). Applying this principle, recent cases from Texas courts have held that each of the UT Appellants are state entities entitled to assert sovereign immunity. *See, e.g., M.D. Anderson Cancer Center*

23

*v. Wang*, No. 01-23-00911-CV, 2024 WL 2853698, at \*2 (Tex. App.—Houston [1st Dist.] June 6, 2024, no pet.) ("As a part of the University of Texas System, M.D. Anderson is a division of the state government and has sovereign immunity from suit to the same extent as the state absent a constitutional or legislative provision waiving its immunity"); *Rudison v. MD Anderson Cancer Center*, 91 F.4th 788, 789 (5th Cir. 2024); *Enriquez v. Univ. of Texas System Bd. of Regents*, No. 03-22-00295-CV, 2024 WL 2787274, at \*5 (Tex. App.—Austin May 31, 2024, no pet.). In the trial court, Gensetix protested that UT had not cited *Texas Supreme Court* cases holding that M.D. Anderson and the Board of Regents were entitled to sovereign immunity. CR:423. But the great weight of this case law removes any reasonable doubt.

Moreover, Texas statutes reaffirm this body of case law. Texas statutes define university systems and institutions of higher education as agencies of the state. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 107.001; TEX. GOV'T CODE §§ 441.101(3); 572.002(10)(B). These statutes incorporate terms defined in Section 61.003 of the Texas Education Code, which in turn specifically identifies M.D. Anderson as a "medical and dental unit" and the University of Texas System as an "other agency of higher education," both of which are "institutions of higher learning." TEX. EDUC. CODE § 61.003(5), (6), (8). The

24

Board of Regents is appointed by the governor, manages and controls The University of Texas System and its member institutions (such as M.D. Anderson), and therefore also comes within the definition of a "state agency." TEX. EDUC. CODE § 61.003(10); § 65.02(a)(11); § 65.11; § 73.001.

## B. Sovereign immunity shields UT from lawsuits asserting breach of contract.

Next, this Court should hold that sovereign immunity prevents plaintiffs from asserting claims for breach of contract against UT because the Legislature has not waived immunity for that claim.

In its First Amended Petition, Gensetix pleaded that UT waived sovereign immunity "by signing a contract with Gensetix and expressly breaching their agreement." CR:101 (¶ 7). In 1997, the Texas Supreme Court explained that while state agencies waive immunity from *liability* by entering into contracts, they do not waive their immunity from *suit*. *Federal Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997). Plaintiffs "must have legislative consent to sue the State on a breach of contract claim." *Id.*

Moreover, the contract at issue in this case specifically states that UT does *not* waive its sovereign immunity rights. CR:70. Section 15.4 of the License states, "Nothing in this AGREEMENT shall be deemed as a waiver

25

by BOARD, SYSTEM, or UTMDACC of its sovereign immunity." *Id.* Accordingly, Gensetix cannot avoid sovereign immunity by simply alleging the execution and breach of a contract—and tellingly, Gensetix did not meaningfully defend this theory in its response to UT's Plea to the Jurisdiction.

Accordingly, to assert a breach of contract claim against Appellants, Gensetix must have permission from the Legislature. *Pepper Lawson Horizon*, 669 S.W.3d at 210. But Gensetix has not argued that its claim comes within any of the many, carefully crafted waivers of sovereign immunity created by the Legislature—because it does not. *See, e.g.*, TEX. LOCAL GOV'T CODE § 271.152 (waiver of immunity for certain contract claims against local government entities); TEX. CIV. PRAC. & REM. CODE § 114.003 (waiver of immunity for some breach of contract claims relating to "engineering, architectural, or construction services"). Gensetix also has not argued that it followed the procedures for petitioning the Legislature for permission to sue. *See* TEX. CIV. PRAC. & REM. CODE Chapter 107 (governing petitions to the Legislature for permission to sue). "[T]hese legislative procedures provide sufficient relief and do not deny constitutional due course of law guarantees." *Federal Sign*, 951 S.W.2d at 411–12.

26

## C. UT cannot waive sovereign immunity "by conduct."

Instead, Gensetix argued that UT waived immunity through "egregious conduct" (CR:101 (¶ 7)), even though Gensetix itself told the federal courts that UT had *not* waived sovereign immunity. *Gensetix*, 966 F.3d at 1323.[13] And on this theory of waiver-by-conduct, Gensetix did everything it could to make the trial judge feel trapped. CR:405, 423-30. Gensetix insisted the trial court had no choice but to follow a single case from 2007, *Texas S. Univ. v. State Street Bank*, 212 S.W.3d 893, 907 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), which is the only case to ever find that "exceptional factual circumstances" sufficed to create an equitable waiver-by-conduct of a state entity's sovereign immunity. CR:405, 423-30. Gensetix further insisted that because *State Street* was a decision from the First Court of Appeals, "*State Street* is the law in Harris County" and "*State Street* is binding precedent in Harris County." CR:405, 427. And Gensetix reiterated

---

[13] This argument is rendered even more problematic due to Gensetix's failure to identify what conduct, exactly, was egregious. For example, in in Gensetix's Petition, UT's "egregious conduct" was terminating the License and then selling the Patents to BCM. CR:248; CR:104-06 (¶¶ 29, 32, 35, 38-40). Yet, Gensetix's Response to UT's Motion to Dismiss, Gensetix suggests the misconduct was requesting dismissal from the 2017 Federal Suit in 2018, which hurt Gensetix's right to exclude. CR:248; *see also* CR:161, 175, 182.

27

that the Texas Supreme Court denied the petition for review in *State Street.* CR:405, 425-27.

Gensetix's arguments were wrong. Subsequent decisions of the Texas Supreme Court leave no doubt that sovereign immunity may *only* be waived by the Legislature through "clear and unambiguous language" and cannot be waived through "conduct." *See infra* (discussing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011) and others); *see also* CR:693-96. These subsequent decisions superseded *State Street. See Mitschke v. Borromeo*, 645 S.W.3d 251, 256-57 (Tex. 2022) (explaining the doctrine of *stare decisis*); *see also, e.g., Rice v. Rice*, 533 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (applying this principle). The Texas Supreme Court's decision to deny review in *State Street* gave the case no special authority, because "[t]he denial or dismissal of a petition does not give any indication of this Court's decision on the merits of the issue." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006).

Nevertheless, one can also understand the trial court's impulse to follow a decision from a court of appeals in the same district. *This* Court has no such constraints, however, and it should not be misled by this one erroneous decision. Instead, this Court must follow the Texas Supreme

28

Court's express rulings and reject Gensetix's legally unsupported theory that UT could have waived sovereign immunity "by conduct."

### 1. The Texas Supreme Court opened the door a tiny crack, and then tried to shut it again.

The "waiver by conduct" exception has a tangled history, which the Texas Supreme Court recounted in *Texas Natural Resource Com'n v. IT-Davy*, 74 S.W.3d 849, 856-57 (Tex. 2002). *IT-Davy* explains that in 1997, the Court's *Federal Sign* opinion held that "by entering into a contract, the State does not waive its immunity from suit." *Id.*, *citing Federal Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997). "But in a footnote, we opined that there may be circumstances 'where the State may waive its immunity by conduct other than simply executing a contract....'" *Id.*, *citing Federal Sign*, 951 S.W.2d at 408 n.1.[14] *Federal Sign* did not offer any further guidance.

The Texas Supreme Court then resisted plaintiffs' efforts to exploit the *Federal Sign* footnote, holding instead that parties must follow a new

---

[14] The *Federal Sign* footnote stated in full, "[w]e hasten to observe that neither this case nor the ones on which it relies should be read too broadly. We do not attempt to decide this issue in any other circumstances other than the one before us today. There may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts."

administrative procedure enacted by the Legislature in the wake of *Federal Sign*. *IT-Davy* explains that in 2001, the Texas Supreme Court held that the Legislature's new administrative remedy "foreclosed a waiver-by-conduct exception to sovereign immunity in breach-of-contract cases." *Id*. (describing the holding of *General Services Com'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 597 (Tex. 2001)). Indeed, *Little-Tex* expressly held that "we conclude that there is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature." *Little-Tex*, 39 S.W.3d at 597. "We refuse to intercede, in light of the Legislature's enactment of Chapter 2260, by judicially adopting a waiver-by-conduct doctrine." *Id*. But *Little-Tex* did not resolve the contract at issue in *IT-Davy*, because the new statute did not apply to contracts executed before August 30, 1999. *IT-Davy*, 74 S.W.3d at 856.

*IT-Davy* then resulted in a split decision as to whether "waiver by conduct" was categorically rejected for all time or merely remained a theoretical possibility. In an opinion for a plurality of four justices, Justice Baker would have categorically shut the "waiver by conduct" door that the Court left open in *Federal Sign*. *Id*. at 856-57. He noted that "several courts of appeals have relied on this footnote to create a judicially-imposed, equitable

30

waiver of immunity from suit." *Id.* But Justice Baker's plurality rejected that rule because of the troublesome litigation it created. *Id.* at 857. "Creating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies." *Id.* (In 2011, the full Texas Supreme Court adopted this very logic when it unreservedly rejected waiver-by-conduct. *See infra*.) The *IT-Davy* plurality held "[w]e again reaffirm that it is within the Legislature's sole province to waive or abrogate sovereign immunity." *Id.*

But in 2002, four justices declined to join this aspect of Justice Baker's *IT-Davy* opinion. In his concurrence for four justices, Justice Hecht explained that he agreed sovereign immunity barred IT-Davy's breach-of-contract claim, but nevertheless he "cannot absolutely foreclose the possibility that the State may waive immunity in some circumstances other than by statute." *Id.* at 862. (He also observed that Justice Baker was the one who had opened the door by writing *Federal Sign* in the first place. *Id.*) For his part, Justice Enoch dissented and wrote a brief opinion criticizing the concurring justices for providing no clear guidance for when a waiver-by-conduct might occur. *Id.* at 863.

31

In its next Term, the Texas Supreme Court again addressed the *Federal Sign* footnote and commented that in several recent cases "we held that the facts these cases presented did not support an equitable waiver by conduct of the governmental entities' immunity." *Catalina Development, Inc. v. County of El Paso*, 121 S.W.3d 704, 705 (Tex. 2003) (citing, *inter alia*, *Little-Tex* and *IT-Davy*). The Court again declined to recognize waiver by conduct on the facts of that case, noting that it had repeatedly held that "acts of contract formation do not, by themselves, waive immunity from suit." *Id.* at 706.

### 2. Courts of Appeals briefly considered the issue unresolved, and the First Court of Appeals issued State Street.

*IT-Davy* and *Little-Tex* made clear that waiver of sovereign immunity was exclusively a matter for the Legislature, and that the Court was split only on the question of whether "waiver by conduct" was utterly forbidden or still theoretically possible. *Little-Tex*, 39 S.W.3d at 597; *IT-Davy*, 74 S.W.3d at 856-57. Nevertheless, by failing to obtain a majority vote for a categorical rule, these cases allowed litigants to press the waiver-by-conduct theory—reinforcing Justice Baker's concern that the theoretical availability of the doctrine would force the State to repeatedly litigate its own right to have never been sued in the first place. *See IT-Davy*, 74 S.W.3d at 857.

32

Trying to discern a rule of decision from *IT-Davy* and *Catalina Development*, some courts of appeals in the mid-2000s concluded that "courts are to evaluate the waiver-by-conduct exception on the facts and equity of each case." *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 220 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Others were far more circumspect. *See, e.g.*, *Smith v. Lutz*, 149 S.W.3d 752, 757-58 (Tex. App.—Austin 2004, no pet.) ("We await further guidance from the supreme court on what additional conduct might be sufficiently egregious to waive the State's immunity from suit."). However, during this period *every court of appeals but one* refused to hold that the hypothetical "waiver by conduct" exception exists in the real world.

That one exception came in 2007, when the First Court of Appeals delivered its opinion in *State Street*. After discussing the Texas Supreme Court's cases from *Federal Sign* to *Catalina*, the First Court held that "[t]he *Catalina* court, which consisted of eight justices and one dissenter (Justice Enoch), clearly establishes that the court will evaluate the waiver-by-conduct exception to sovereign immunity on the facts of each case, not as a categorical matter or bright-line rule." *State Street*, 212 S.W.3d at 907. *State Street* then held that "[t]he Texas Supreme Court has never addressed a

33

waiver-by-conduct exception argument faced with the 'extraordinary factual circumstances' as the trial court described them here." *Id*. Those "extraordinary factual circumstances" included the allegation that Texas Southern University lured the plaintiff into a lease "with false promises that the contract would be valid and enforceable," accepted $13 million in equipment and services from the plaintiff, and then "disclaimed any obligation on the contract by taking the position that the contract was not valid after all" because it had never been properly authorized. *Id*.

*State Street* was wrongly decided on the day it was issued. *Little-Tex*, *IT-Davy*, and *Catalina Development* described "waiver by conduct" more like a unicorn than a "clearly establish[ed]" rule that left the courts of appeals free to create the doctrine on a case-by-case basis. *Cf. State Street*, 212 S.W.3d at 907. The First Court tried to limit its holding to "extraordinary factual circumstances," but *State Street* did not give sufficient weight to the reticence shown by the Texas Supreme Court's opinions.

Before the year was out, the Texas Supreme Court issued a new opinion that undermined *State Street*'s reasoning. In *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835 (Tex. 2007), the Court repeated its holding that "the State does not waive its immunity from a breach-of-contract action by

34

accepting the benefits of a contract." *Id.* at 840 (citing *Little-Tex*, *IT-Davy*, *Catalina Development*, and others). The Court reiterated *Little-Tex*'s holding that "there is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature." *Id.* (quoting *Little-Tex*, 39 S.W.3d at 597). The *Koseoglu* Court said nothing about the possibility that courts might invent an equitable exception to this rule, or that "waiver by conduct" should be assessed based on the facts of each case—which *State Street* wrongly claimed was "clearly" the test intended by the Texas Supreme Court.

Similarly, the courts of appeals expressed dismay with *State Street*. In 2010, the Fourteenth Court of Appeals contrasted *State Street* by noting that "[i]n the absence of such guidance from the Supreme Court [that a waiver-by-conduct exception exists], this court has likewise declined to craft some judicial exception to immunity." *W.W. Webber, L.L.C. v. Harris County Toll Road Auth.*, 324 S.W.3d 877, 883-84 (Tex. App.—Houston [14th Dist.] 2010, no pet.). In 2011, the Amarillo Court of Appeals held *State Street* was wrongly decided because it violated the oft-repeated principle that the Legislature alone can waive sovereign immunity. *Leach v. Texas Tech Univ.*, 335 S.W.3d 386, 401 (Tex. App.—Amarillo 2011, pet. denied) ("If the highest civil court

in Texas truly means what it said, then the holding in *State Street* simply is wrong."). While many courts of appeals have mentioned *State Street*, *none* have endorsed the First Court's holding or adopted the "waiver by conduct" theory of sovereign immunity. *See infra* (discussing the courts of appeals' universal rejection of *State Street* in the last fifteen years).

### 3. The Texas Supreme Court categorically rejected the theory that sovereign immunity can be "waived by conduct."

In 2011, the Texas Supreme Court categorically rejected the "waiver by conduct" rule in *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011). *Sharyland* explicitly embraced Justice Baker's plurality opinion in *IT-Davy* as the position of the full Court.

In *Sharyland*, Sharyland sued the City of Alton for breaching a water supply agreement and the City invoked its sovereign immunity from suit. *Id*. at 410. The Texas Supreme Court rejected Sharyland's many attempts to pierce the City's immunity. First, the Court reasoned the Legislature had waived the city's sovereign immunity through Local Government Code § 271.152, but Sharyland was not seeking damages that came within the specific categories of compensation the Legislature had elected to allow. *Id*.

at 412-13. Second, the City had not waived its sovereign immunity by filing a counterclaim for mere declaratory relief. *Id*. at 413-15.

And most importantly for the case at bar, the *Sharyland* Court then rejected Sharyland's attempt to use the *Federal Sign* footnote to invoke equitable waiver-by-conduct. *Id*. at 414. The Court explained its reasoning broadly and categorically, leaving no room for future courts to revive the doctrine:

- "Five years after *Federal Sign*, however, we rejected the invitation to recognize such a waiver, holding that it was generally the Legislature's province to waive immunity." *Id*. (citing *IT-Davy*).

- "We noted that '[c]reating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections— and this would defeat many of the doctrine's underlying policies.'" *Id*. (quoting *IT-Davy* at 857).

- "We also emphasized that the Legislature had enacted comprehensive schemes that allow contracting parties to resolve breach-of-contract claims against the government." *Id*. (citing *IT-Davy*).

37

- "By providing these avenues for redress, the Legislature has balanced competing private and public interests—a balance that would be thwarted if we allowed waiver-by-conduct exceptions in breach-of-contract actions against the government." *Id*.

Importantly, the *Sharyland* Court conspicuously treated Justice Baker's plurality opinion in *IT-Davy* as "dispositive," with no discussion of the concurrence or the possibility of a hypothetical future case in which sovereign immunity might be waived through conduct. *Id*. Any attempt to create "waiver by conduct" through the *Federal Sign* footnote would conflict with the legal and policy determinations expressed in *Sharyland*.

*Sharyland* intentionally closed the door on the waiver-by-conduct theory. The courts of appeals have held they will not find that a "waiver by conduct" exception exists post-*Sharyland* without a new decision of the Texas Supreme Court expressly holding that it does, and they have rejected *State Street* accordingly. *TGP Public Schools, Inc. v. Powell Law Group, LLP*, No. 03-22-00200-CV, 2024 WL 1333991, at *7 (Tex. App.—Austin May 29, 2024, no pet.); *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 565 S.W.3d 69, 75 & n.3 (Tex. App.—Dallas 2017), *aff'd & rev'd on other grounds*, 576 S.W.3d 362 (Tex. 2019); *Hughes v. Tom Green County*, 553 S.W.3d 1, 8-10 (Tex. App.—

Austin 2017), *rev'd on other grounds*, 573 S.W.3d 212 (Tex. 2019); *Jefferson County v. Stines*, 523 S.W.3d 691, 725 (Tex. App.—Beaumont 2017), *rev'd on other grounds*, 550 S.W.3d 178 (Tex. 2018); *City of Conroe v. TPProperty, LLC*, 480 S.W.3d 545, 565 (Tex. App.—Beaumont 2015, no pet.); *TXU Energy Retail Co. L.L.C. v. Fort Bend ISD*, 472 S.W.3d 462, 467 (Tex. App.—Dallas 2015, no pet.); *Alternatives Unlimited, Inc. v. Raymondville ISD*, No. 13-13-00363-CV, 2014 WL 3737973, at *5 (Tex. App.—Corpus Christi-Edinburg Mar. 20, 2014, no pet.); *Labrado v. Univ. of Texas at El Paso*, 2012 WL 43385, at *3-4 & n.5 (Tex. App.—Austin Jan. 5, 2012, no pet.). Ours is not the case for any court to try to pry the door open.

For its part, the First Court of Appeals recently conceded that after *Sharyland*, the Texas Supreme Court has not "clarif[ied] what sort of conduct, if any, would warrant a waiver-by-conduct exception"—and then avoided the issue by deciding the case on other grounds. *Harris County Fresh Water Supply Dist. No. 61 v. Magellan Pipeline Co., L.P.*, 649 S.W.3d 630, 641-42 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). *See also City of Freeport v. Briarwood Holdings, LLC*, No. 01-11-01108-CV, 2013 WL 1135676, at *3-4 (Tex. App.—Houston [1st Dist.] Mar. 19, 2013, no pet.) (refusing to address the

39

argument that *Sharyland* overruled *State Street* because it concluded the facts of that case did not support the application of *State Street* anyway).

Finally, a recent Texas Supreme Court decision reaffirms *Sharyland*'s holding that it is categorically impossible to waive sovereign immunity by conduct. *Oncor Elec. Delivery Co. NTU, LLC v. Wilbarger County Appraisal Dist.*, 691 S.W.3d 890 (Tex. 2024). *Oncor* involved the jurisdictional impact of a "statutory agreement" under Section 1.111(e) of the Tax Code. *Id.* at 894. The Court ultimately held that such agreements merely provide a defense on the merits, and do not deprive a district court of subject-matter jurisdiction. *Id.* at 904-07. The Court noted that it had previously held that such agreements were merely voidable—not void—if fraudulently induced. *Id.* at 907 (citing *Willacy County Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 40 (Tex. 2018)). It then explained, "[t]his voidable nature of a fraudulently induced Section 1.111(e) agreement is likewise inconsistent with treating the inducement defense as jurisdictional, *as sovereign immunity must be waived by the Legislature rather than by a party's conduct.*" *Id.* (emphasis added). The Court did not muse about the possibility of a hypothetical case in which sovereign immunity could be waived through conduct—it observed that conduct cannot waive sovereign immunity, just as it held in

40

*Sharyland* in 2011. This observation is all the more conspicuous in this case, because the "fraudulent inducement" being discussed in *Oncor* was more "extraordinary" than the "extraordinary factual circumstances" that supposedly justified waiver in *State Street*.

To be sure, *Oncor* did not directly address the waiver-by-conduct theory or cite *Sharyland*, *IT-Davy*, or other such cases. But it adds another brick to the wall of authorities that reject *State Street*'s outdated analysis. Courts do not "evaluate the waiver-by-conduct exception to sovereign immunity on the facts of each case." *Cf. State Street*, 212 S.W.3d at 907. Instead, waiver lies solely in the Legislature's discretion, and allowing waiver-by-conduct "would defeat many of the doctrine's underlying policies" by forcing the State to repeatedly litigate its own right to be free from litigation. *Sharyland*, 354 S.W.3d at 414.

### 4. *Conclusion: Waiver-By-Conduct is not a Valid Theory for Defeating Sovereign Immunity*

In sum, this Court should do what the trial court apparently felt it could not—apply more-recent Texas Supreme Court authority instead of an erroneous and older decision from the First Court of Appeals. This Court should hold that *Sharyland* categorically rejected the "waiver by conduct"

41

theory. Alternatively, this Court should join all the Texas courts of appeals since *Sharyland* (except the First Court) and refuse to apply "waiver by conduct" unless and until the Texas Supreme Court provides further guidance. Because *State Street*'s theory of "waiver by conduct" was Gensetix's only theory for evading Appellants' sovereign immunity, this Court should reverse and render judgment that UT's plea to the jurisdiction is granted on Gensetix's breach of contract claim.

### D. At any rate, the facts of this case do not rise to the level of *State Street*.

Even if *State Street* remained valid authority, it would not support the trial court's erroneous decision to deny Appellants' plea to the jurisdiction. The facts of this case fall far short of the "extraordinary factual circumstances" that led the First Court to find an equitable waiver-by-conduct of sovereign immunity.

One can gather the "extraordinary factual circumstances" of *State Street* into three elements: (1) Texas Southern University made specific representations to a contractor that a lease and purchase contract was "valid and enforceable"; (2) in reliance on those representations, the contractor fully performed by providing $13 million in equipment and services to the

42

university;[15] and then (3) the university declared that the contract had never been valid (because it had not been properly authorized), refused to make any payment whatsoever, and kept the equipment. *State Street*, 212 S.W.3d at 898-99, 907.

This case differs from the *State Street* "bait and switch" in two important respects:

First, this is not a situation in which one side fully performed under the contract, and the other refused to pay a single dime without disputing the quality of the other party's performance. *Cf. State Street*, 212 S.W.3d at 905. In the trial court, Gensetix insisted that it had partially performed under the contract. CR:428-29. But that does not bring this case in line with *State Street.* Here, UT terminated the License because Gensetix did *not* perform as required—it did not provide annual reports on its commercialization efforts and pay annual license fees. Though Gensetix claims these requirements were merely pretextual, *see* CR:419, the resulting dispute does not resemble *State Street*.

---

[15] The contractor was hired to improve energy efficiency on campus, the largest part of which was upgrading the chillers in the thermal plant. *State Street*, 212 S.W.3d at 898 n.5, 907-08.

43

Second, this is not a situation where the state agency promised that the contract was valid and enforceable, and then later reversed course and took the position that the contract had never been valid in the first place. On this point, Gensetix argued this case resembled *State Street* because UT had promised the License was valid. CR:429. UT agrees—it *was* a valid contract. But UT then terminated that valid contract according to express terms authorizing the termination. *See* CR:63-66. The termination did not contradict any earlier representations, so *State Street* is inapposite.

Finally, Gensetix used sharp language to describe its factual allegations, in the hope of making its breach of contract claim sound more like the "extraordinary factual circumstances" cited by the First Court in *State Street*. CR:428-30. Yet while this Court must read the First Amended Petition deferentially, the Texas Supreme Court recently reminded courts that they "cannot use a liberal construction of the petition as a license to read into the petition a claim that it does not contain." *Texas Tech Univ. System*, 691 S.W.3d at 419. And in this overheated telling, Gensetix does not assert a "bait and switch" or a claim for fraudulent inducement—it asserts a straightforward claim for breach of contract. *Cf. id.*

Gensetix primarily argues that UT had "extracontractual ulterior motives" for terminating the License because of what it describes as "side-dealing." CR:428-30. But even if one credits Gensetix's complaints about "ulterior motives"—and UT vigorously denies these allegations—**motives are irrelevant in a suit alleging breach of a commercial contract**. The Texas Supreme Court repeatedly held that contracts do *not* contain an implicit duty of good faith and fair dealing apart from the text of the contract itself. *Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490-92 (Tex. 2019); *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000); *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983). A contracting party may always "compel his adversary to perform according to the contract terms as agreed upon by the parties." *English*, 660 S.W.2d at 522. Either UT had the right to terminate the License, or UT did not; that is a breach-of-contract dispute and *State Street* is inapposite.[16]

---

[16] In the trial court, Gensetix also cited a concurring and dissenting opinion from the Federal Circuit, which it characterized as harshly criticizing UT. CR:428; *see also* CR:98. In that opinion, Judge Pauline Newman expressed her view that a State should be subject to suit under the Eleventh Amendment any time it "enters into commerce," and that the Board of Regents thus failed to "cooperate" because it invoked its sovereign immunity from suit. *Gensetix*, 966 F.3d at 1329 (Newman, J., concurring and dissenting). The Texas Supreme Court views sovereign immunity quite differently, however, as evidenced in *Federal Sign* and subsequent cases.

This Court should hold that "waiver by conduct" does not exist, for all the reasons explained above. Even if this Court does not want to apply the categorical statements of *Sharyland*, it should hold that the facts of this case do not rise to the level that would justify an exception under the *Federal Sign* footnote.

**E.    This Court should not abrogate sovereign immunity altogether.**

Next, this Court should not abolish the doctrine of sovereign immunity in Texas, as Gensetix argued in the trial court. If the trial court chose to rely on this argument to justify its Order—and *surely* no one thinks that it did—then that would have been reversible error.

UT only raises the issue because Gensetix concluded its trial court Response to UT's Plea to the Jurisdiction with a lengthy and vigorous argument that Texas courts should abolish the doctrine of sovereign immunity altogether. CR:436-48. Gensetix contended that the doctrine had no valid support in English common law, and that the Texas Legislature's only affirmative recognition of sovereign immunity is found in an inapplicable abortion statute. *See* CR:436-48.

To its credit, Gensetix conceded that its request to abolish sovereign immunity expressly contradicted two Texas Supreme Court cases, which it asked the trial court to "overturn." CR:442-43 (presenting argument against *Hosner v. De Young*, 1 Tex. 764, 769 (1847) and *Federal Sign*). It also disputed the reasoning in a third Texas Supreme Court opinion, *Wichita Falls State Hospital v. Taylor*, without acknowledging that the opinion bluntly embraced the doctrine of sovereign immunity—and thus must be "overturned" to grant the relief Gensetix seeks. 106 S.W.3d 692, 694 (Tex. 2003); CR:442. Gensetix failed to cite the dozens of other Texas Supreme Court cases that affirm the existence of sovereign immunity, most recently *Kensington Title-Nevada, LLC v. Tex. Dep't of State Health Servs.*, No. 23-0644, 2025 WL 937478, at *4 (Tex. 2025).

> Gensetix admitted its ultimate audience was an appellate court:

> Gensetix respectfully preserves the preceding arguments for appellate review and, if necessary, will ask that *Hosner* and *Federal Sign* be overturned, and that sovereign immunity be abolished in view of these previously unconsidered policy grounds.

CR:448; *see also* RR:14. If so, *this* is not the proper appellate court to "overturn" dozens of binding Texas Supreme Court precedents. This Court recently—and correctly—recognized it is bound by decisions of the Texas

47

Supreme Court. *See Burns v. City of San Antonio*, No. 15-24-00009-CV, 2025 WL 996377, at *12 n.6 (Tex. App.—15th Dist. Apr. 3, 2025, reh'g denied, no pet. h.); *see also, e.g.*, *Mitschke*, 645 S.W.3d at 256. This Court cannot "abolish" sovereign immunity. Likewise, it cannot affirm the trial court's order on that ground.

## F. Conclusion: This Court should reverse and render judgment granting the plea to the jurisdiction.

In sum, UT may assert sovereign immunity, and this Court should reject Gensetix's arguments to the contrary. The trial court erred by denying UT's plea to the jurisdiction. This Court should render judgment dismissing the claim, because "[i]f the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the parties an opportunity to amend." *Miranda*, 133 S.W.3d at 227.

## II. This Court must reverse because Gensetix did not plead a valid "takings" claim.

Gensetix also asserted a constitutional "takings" claim under article I, section 17 of the Texas Constitution. CR:105-06; CR:430-36. The State of Texas has no sovereign immunity against a properly pleaded claim that it took property without just compensation. *Little-Tex*, 39 S.W.3d at 598. Nevertheless, this Court must reverse. Gensetix is just the latest in a long line

of plaintiffs who tried—and failed—to cloak their breach-of-contract claim with the rhetoric of "takings" to try to circumvent sovereign immunity. *See id.* at 598-99; *see also infra*.

### A. UT may demonstrate its lack of intent through a plea to the jurisdiction.

The Texas Supreme Court recently reiterated that state entities may file a plea to the jurisdiction to establish that they are entitled to dismissal because they lack the intent necessary to support a constitutional takings claim. *Texas Dep't of Transp. v. Self*, 690 S.W.3d 12, 26 (Tex. 2024). The first element of a takings claim is that the state entity "intentionally performed certain acts." *Id.* "[S]uch a requirement helps ensure that the taking is for public use.'" *Id.*[17] This element requires "evidence that the entity either (a) 'intended to damage the property' or (b) 'knew that its conduct was causing identifiable harm' or that 'specific property damage was substantially certain to result from the conduct.'" *Id.*[18]

"If a defendant files a plea to the jurisdiction showing that the plaintiff has not alleged these elements and cannot amend its petition to do so, or if

---

[17] Citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821-22 (Tex. 2009).

[18] Quoting *City of Dallas v. Jennings*, 142 S.W.3d 310, 313-14 (Tex. 2004) (quote presented as in *Self*).

the defendant negates an element in an evidentiary plea, the takings claim must be dismissed." *Self*, 690 S.W.3d at 26.[19] "Although the fact-finder may need to "resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Id.*[20]

## B. State entities lack "intent" to take property when they act pursuant to a contract.

*Self* also reiterated the rule that requires this Court to reverse: "no compensation is owed when the government acts on its rights under a contract to which the parties have consented because it is not exercising sovereign powers." *Self*, 690 S.W.3d at 27 & n.18.[21] The Texas Supreme Court provided more detail in *Little-Tex. See Little-Tex*, 39 S.W.3d at 598-99. "The State does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute. Rather the State is acting within a color of right under the contract and not under its eminent domain powers." *Little-Tex*, 39 S.W.3d at

---

[19] Citing *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014) and *Miranda*, 133 S.W.3d at 224.

[20] Citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998).

[21] Citing, *inter alia*, *Little-Tex*, 39 S.W.3d at 598-99.

598-99. The State "is acting akin to a private citizen and not under any sovereign powers. In this situation, the State does not have the intent to take under its eminent domain powers; the State only has an intent to act within the scope of the contract." *Id.* at 599.[22]

The Texas Supreme Court has repeated this rule since *Little-Tex*. *See Self*, 690 S.W.3d at 27 & n.18; *State v. Holland*, 221 S.W.3d 639, 643-44 (Tex. 2007). Texas's appellate courts have applied this rule to prevent a variety of plaintiffs from evading sovereign immunity by characterizing contract disputes as a "takings" claim:

- When a city took control of a golf-course concession in response to the concessionaire's failure to pay the necessary commissions on food and beverages, there was no "taking" because the city was acting pursuant to an express contractual right. *City of San Antonio v. Polanco & Co., LLC*, No. 04-07-00258-CV, 2007 WL 3171360, at *6 (Tex. App.—San Antonio Oct. 31, 2007, pet. denied).

- When the plaintiff voluntarily provided services through contracts his companies had with the State, the Texas Supreme Court held he

---

[22] Citing *Green Int'l, Inc. v. State*, 877 S.W.2d 428, 434 (Tex. App.—Austin 1994, writ dism'd by agr.).

could not assert a "taking" claim to recover additional patent royalties for those same services—the State accepted those benefits pursuant to the contracts, not by seizing them for a public use. *Holland*, 221 S.W.3d at 643-44.

- When Texas Tech's football coach filed suit to recover compensation the university refused to pay, the result was a mere contractual dispute that could not be recharacterized as a governmental "taking" of the money he alleged he was owed. *Leach*, 335 S.W.3d at 398.

- When the plaintiff voluntarily provided software to a state university pursuant to contract, and the university refused the plaintiff access to the software due to a dispute over contract performance, the state did not have the necessary intent to support a "takings" claim. *Smith*, 149 S.W.3d at 760-61.

- When a community college district terminated a billboard lease by invoking its new rights as a bona-fide purchaser, it had acted pursuant to contract and not eminent domain, even though it had previously expressed its willingness to use eminent domain if necessary to achieve its goals. *Dallas County Comm. College Dist. v.*

*Clear Channel Outdoor, Inc.*, No. 05-07-00701-CV, 2008 WL 3307085, at \*3 (Tex. App.—Dallas July 31, 2008, pet. denied).

- When the Galveston Port Facilities Corporation made improvements to the rooftop of the Galveston Cruise Ship Terminal, which was subject to a lease, the improvements only impaired the lessee's contract rights and thus did not have the intent necessary for a "taking." *MBP Corp. v. Bd. of Trustees of Galveston Wharves*, 297 S.W.3d 483, 489-91 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

- The City of Weslaco did not "take" the plaintiff's property stored in an aircraft hangar when it terminated his lease for the hanger under an express termination provision; it acted solely pursuant to a contract, and did not exercise any power of eminent domain. *City of Weslaco v. De Leon*, No. 13-20-00561-CV, 2022 WL 3652501, at \*4 (Tex. App.—Corpus Christi-Edinburg Aug. 25, 2022, pet. denied).

This rule serves a critical purpose in Texas jurisprudence. If a party could defeat sovereign immunity by simply alleging that a state agency "takes" the fruits of a contract by breaching it, that exception would quickly swallow the rule. Instead, the Texas Supreme Court has repeatedly held that

53

courts must filter out "takings" claims that do nothing more than repackage a breach of contract claim. *Little-Tex*, 39 S.W.3d at 598-99. Even in *State Street*—the singular focus of Gensetix's contract arguments—the First Court rejected the plaintiff's takings claim because it had provided the equipment and services voluntarily under a contract. *State Street*, 212 S.W.3d at 911. "Viron voluntarily and with its own consent delivered the equipment to TSU after making the Master Lease. In so doing, Viron cannot now say that the equipment was taken under the power of eminent domain." *Id.*

## C. Appellants acted pursuant to contract, and thus lacked intent.

In this case, every part of Gensetix's "takings" claim arises from the License, and thus defeats any allegation that UT chose to "take" property through eminent domain. Gensetix alleges that the "property" taken in this case was an exclusive license to the Patents. CR:105-06; CR:433. But Gensetix obtained those rights through the License, a contract. Likewise, the "destruction" of this "right" was UT's termination of the License in accordance with its express terms. CR:99. Gensetix pleads that its damages for the alleged "taking" is the money it could have obtained from conveying a controlling interest in the Patents to a willing buyer. CR:99; CR:106; CR:433.

In the trial court, Gensetix argued that its contract and takings theories were different because:

- The remedy for a "taking" is labeled "just compensation," whereas the remedy for breach of contract is labeled "actual damages" (CR:433-35);

- "Takings" claims require permanent loss of the property, whereas breach-of-contract claims do not need to be permanent because the plaintiff can recover nominal damages (CR:433, 435); and

- The contract claim involved "nonperformance" whereas its takings claim involved "destruction" and "damage" to its rights. *Id*.

This sophistry does not convert Gensetix's contract theory into a true "takings" claim, any more than the plaintiffs in the cases cited above. *See, e.g.*, *Polanco*, 2007 WL 3171360, at *6; *Holland*, 221 S.W.3d at 643-44; *Smith*, 149 S.W.3d at 760-61.

Even if it is *theoretically* possible for plaintiffs to plead "takings" claims that differ from their contract claims, that is not what Gensetix did in this case. It seeks "just compensation" in the form of the proceeds from licensing the Patents to a willing buyer—which is just another way of describing the benefit of its bargain under the contract that licensed the Patents to Gensetix in the first place. *See* CR:436. In both claims, Gensetix complains of the

permanent loss of the right to license the Patents to a buyer. CR:433-36; CR:105-07. And the alleged "nonperformance" is that Appellants used a "pretext" to terminate the License. *See* CR:106-07 (First Amended Petition); CR:435. Neither allegation can be squared with the fact that UT offered to sell the Patents to Gensetix at the same price that BCM ultimately paid. Nevertheless, in Gensetix's allegations, the termination of the License is what supposedly "destroyed" Gensetix's right to license the Patents to a buyer. Regardless of the label placed on each element, the underlying allegation is the same.

Most importantly, Gensetix offered no allegation that UT acted out of an intent to use eminent domain to seize the rights conferred by the License. *See Little-Tex*, 39 S.W.3d at 598-99. The allegations remain grounded in a contract dispute. In fact, any allegation about "eminent domain" would make no sense on the facts of this case, because UT owned the Patents in the first place and licensed them to Gensetix's predecessor-in-interest—that is to say, *the property that UT allegedly "took" was its own property*. CR:102. Gensetix had no greater right to UT's property than what was granted in the License. Appellants *cannot* have "taken" those rights apart from their intent to act under the License.

To sum up, Gensetix did not allege the requisite "intent" to support a constitutional takings claim. This Court must reverse the trial court's denial of the plea to the jurisdiction and render a new judgment that dismisses the takings claim. *Self*, 690 S.W.3d at 26.

## D. Gensetix failed to plead other necessary elements of a takings claim.

Even if Gensetix had properly pleaded a valid "intent" for its takings claim, this Court should still reverse and render judgment against that claim because Gensetix did not plead other necessary elements. These arguments overlap to some extent with the breach-of-contract arguments above, because Gensetix's attempt to claim a "taking" of its rights under the License violates many different elements of a takings claim. But each of these elements provides a different lens through which this Court can view Gensetix's deficient pleading.

### 1. The License did not create a "vested property right" that can support a takings claim.

First, Gensetix cannot claim it had a property right that can give rise to a "takings" claim. A constitutional takings claim requires the plaintiff to show that it has a vested property interest in the "taken" property. *Texas Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 655 (Tex.

2022); *Texas Parks & Wildlife Dept. v RW Trophy Ranch, Ltd.*, No. 15-24-1074467, 2025 WL 1074467, at *6 (Tex. App.—15th Dist. Apr. 10, 2025, no pet. h.). "A right is 'vested' when it has some definitive, rather than potential, existence." *Scott v. Alphonso Crutch LSC Charter Sch., Inc.*, 392 S.W.3d 165, 170 (Tex. App.—Austin 2010, pet. denied).

In an attempt to satisfy this requirement, Gensetix pleads it had an "exclusive patent license" that was "destroyed" when UT terminated the License. CR:105-06. To reiterate: the Patents *have always belonged to UT.* Indeed, the License expressly reiterates that UT owns them. CR:67 (¶ 14.1). UT merely *licensed* the Patents to Gensetix's predecessor-in-interest, but the License ended when UT exercised its right to terminate it. *See* 2CR; CR:63-66. This is not a case in which *Gensetix* created the Patents and licensed them to *UT*. What Gensetix "lost" was a contractual right to use the Patents without infringing on UT's Patents, not the Patents themselves.

Moreover, the License did not even provide Gensetix with exclusive control, despite Gensetix's vague insistence in the trial court that the License was "exclusive." CR:105-06. The federal district court explained that UT retained significant rights in the Patents. *Gensetix*, 354 F. Supp. 2d at 769-70. Though the License conferred a duty on Gensetix to enforce the Patents, UT

also "retain[ed] a broad right to sue and control litigation." *Id.*; CR:58-59. The federal district court cited several other elements of the Patents that UT retained,[23] and concluded, "Gensetix's right to license the patent is not truly 'exclusive.'" *Id.* at 770. Moreover, Gensetix required UT's permission to sublicense the Patents to a non-affiliate. *Id.* at 771. For this reason, the federal courts concluded Gensetix lacked the "substantial rights" in the Patents necessary to confer standing to assert patent infringement. *Id.*

In this case, by terminating the License, UT did not take a "vested property interest" from Gensetix. The right was not "vested" in Gensetix because it was wholly contingent upon, for example, Gensetix fulfilling its contractual obligations. Instead, the right was created by a License that could be—and *was*—terminated by UT.

Nor did the License confer a "property interest" substantial enough to be protected by the Texas Constitution. Gensetix had no "property interest" for the same reason the federal district court held it had no "substantial

---

[23] "Notably, UT retained the right to publish general findings, use licensed subject matter for research, teaching, or other academic purposes, and transfer rights to other research institutions for non-commercial research use. UT may practice and license the patent for non-commercial use; accordingly, while there are some limits on UT's right to license the patent, it still retains the right to do so." *Gensetix*, 354 F. Supp. 2d at 770.

rights" that would enable it to pursue a patent infringement claim. *See supra.* Its rights under the License were limited by the powers UT retained over the Patents. When it complains of a "taking," Gensetix is really alleging that UT should not have terminated the License.

Moreover, Gensetix cannot base its claims on the Patents themselves, which is an important distinction because patents can be a valid "property interest" under the Fifth Amendment.[24] *See, e.g., Horne v. Dep't of Agriculture,* 576 U.S. 350, 359-60 (2015). Gensetix never owned the Patents—UT did. And when Gensetix was given the option to buy the Patents, it declined.

Instead, Gensetix complains that a partial *license* to use the Patents was "destroyed" when UT terminated the License according to its terms. Gensetix has never cited a case supporting this theory that a governmental patent owner's termination of the license of its patent constitutes a "taking." CR:430-32. It would have difficulty doing so, because Texas courts have declined to find that rights created under a contract are the sorts of

---

[24] Gensetix's claim still would not describe a valid "taking," however, because the federal courts have held that patent owners must use a statutory cause of action and not a "takings" claim when the government essentially seizes an *ad hoc* patent license by infringing on the patent. *See Christy, Inc. v. United States,* 141 Fed. Cl. 641, 657-60 (Fed. Cl. 2019) (recounting the lengthy history of this understanding).

"property" rights that can be "taken" by eminent domain, reasoning that Article I, Section 17 has only ever been held to apply to rights in real property. *See Cypress Forest Pub. Utility Dist. v. Kleinwood Mun. Utility Dist.*, 309 S.W.3d 667, 675 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also, e.g.*, *State/Operating Contractors ABS Emissions, Inc. v. Operating Contractors/State*, 985 S.W.2d 646, 652-54 (Tex. App.—Austin 1999, pet. denied) (distinguishing governmental franchises from other sorts of contracts, which do not support a takings claim).

Tellingly, the trial court specifically and repeatedly asked Gensetix at the hearing whether it had any legal authority to support its contention that terminating the License could constitute a constitutional "taking." RR:23-24. Gensetix finally admitted it could cite no case with a similar fact pattern. RR:24. Instead, it cited two cases holding that the permanent physical occupation of real property is a *per se* taking that does not require the application of a balancing test. *Id*. (citing *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 772 (Tex. 2021) and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982)). These cases have nothing to do with a state entity's termination of a patent license agreement. Unfortunately, the trial court did not have a transcript of the hearing

61

available three years later, when he issued his terse opinion that gave no explanation and cited no case law. CR:771.

Texas law ensures that these questions should never arise in the first place, because Texas courts have repeatedly held that a state entity does not have the "intent" to exercise eminent domain when it acts pursuant to a contract. But Gensetix's inability to describe a "vested property interest" in this contract reiterates the importance of that rule, and explains why Gensetix did not properly allege a valid takings claim.

### 2. Gensetix did not plead that the State acquired the property through "physical" or "regulatory" means.

Gensetix also did not (and could not) allege that UT took (or revoked) its Patents' license through "physical" or "regulatory" means. "Takings may be classified as either physical or regulatory." *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 622 (Tex. 2021).[25] "A physical taking occurs when the government literally takes property from its owner, such as when it 'authorizes an unwarranted physical occupation of an individual's property.'" *Id.*[26] "A regulatory taking occurs when the government restricts

---

[25] Citing *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004).

[26] Quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998).

a property owner's rights to such an extent as to become the functional equivalent of a physical seizure." *Id.*[27]

Gensetix pleaded neither. Gensetix has not pleaded any physical occupation of its alleged "property," nor that anything was literally taken away from it. *Cf. id.* And it has not pleaded any act of regulation that restricted Gensetix's alleged rights either. *Id.* The only thing that happened was that UT terminated the License, as it had every right to do.

In the trial court, Gensetix's only counterargument was that the trial court should not show "slavish devotion to judge-made, form-over-substance, multi-factor tests," because Gensetix argued there was no constitutional basis for what it described as the "judge-made 'physical/regulatory' dichotomy." CR:432, quoting *ETC Marketing, Ltd. v. Harris County Appraisal Dist.*, 528 S.W.3d 70, 90 (Tex. 2017) (Brown, J., concurring).[28] The Texas Supreme Court has repeatedly held that Article I, Section 17 gives rise to this dichotomy, and neither the Harris County district

---

[27] Citing *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 490 (Tex. 2012).

[28] In the quoted passage, Justice Brown nevertheless admitted that the Court was bound to apply the U.S. Supreme Court's multi-factor test notwithstanding his criticism of it. *Id.* Justice Brown's complaints evoke sympathy, but they have nothing at all to do with this case.

court nor *this* Court are free to reject it as "judge-made." *San Jacinto River Auth.*, 627 S.W.3d at 622. Adherence to binding precedent is neither "slavish devotion" nor "form over substance." *Cf.* CR:432.

The hard reality is that Gensetix cannot plead a valid form of "taking" because UT did not commit a constitutional "taking" by terminating the License according to the negotiated terms.

### 3. Gensetix has not alleged a "public use."

Finally, Gensetix did not allege this purported "taking" was for a "public use." *See* CR:105-06. "[O]ur Constitution provides for compensation only if property is damaged or appropriated 'for or applied to public use.'" *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554-55 (Tex. 2004). As *Gragg* explains, "public use" helps distinguish the effects of mere negligence from an intentional decision to destroy property for the public good, as in *Gragg* where the State built a reservoir knowing it would result in the persistent flooding of a downstream ranch. *Id.* at 554-56.

Gensetix alleges no such "public use," and cited no case law explaining how that required element could be satisfied on these facts. *See* CR:95-108; CR:431-36. To the contrary, Gensetix complains that UT terminated the License, and then subsequently sold the Patents to Baylor College of

64

Medicine (while also offering them to Gensetix at the same price). CR:105. As with all the arguments above, this dispute over a license agreement is not a real "takings" claim about the intentional seizure of a vested property interest for the "public use."

It becomes evident that the only reason Gensetix pleaded this breach-of-contract dispute as a constitutional "taking" is to avoid UT's clear right to invoke sovereign immunity. This Court must put an end to this attempted end-run.

## Conclusion and Prayer

This Court should reverse the trial court's order denying UT's Plea to the Jurisdiction, and render judgment that Gensetix's claims be dismissed.

By: /s/ David E. Harrell, Jr.
David E. Harrell, Jr.
  State Bar No. 00793905
  David.Harrell@troutman.com
Deanna Markowitz Willson
Chris Dove
**TROUTMAN PEPPER LOCKE LLP**
600 Travis St., Suite 2800
Houston, Texas 77002

Terri M. Abernathy
  Assistant Attorney General
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548, Capitol
Austin, TX 78711

**ATTORNEYS FOR APPELLANTS**

## Certificate of Compliance

I certify that this Brief of Appellants complies with TEX. R. APP. P. 9.4(i) because the relevant portions of the Brief contains 12,237 words, as counted by Microsoft Word 365.

/s/ Chris Dove
Chris Dove

## Certificate of Service

Pursuant to TEX. R. APP. P. 9.5(e), I certify that a true and correct copy of the foregoing document was served via electronic filing on the 9th day of June 2025, to:

Ryan Pigg
BUZBEE LAW FIRM
600 Travis St., Suite 7500
Houston, TX  77002

Jennifer Tatum Lee
CONNOR LEE & SHUMAKER PLLC
609 Castle Ridge Rd., Suite 450
Austin, TX  78746-5196

*Attorneys for Appellee*

/s/ Chris Dove
Chris Dove

## Appendix

1. Order Denying Plea to the Jurisdiction (CR:771)

2. License (CR:46-73)

3. First Amended Petition (CR:95-109)

4. Notice of Termination (2SuppCR, forthcoming)

Appendix Tab 1

Order Denying Plea to the Jurisdiction (CR:771)

3/11/2022 4:15 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 62549487
By: KATINA WILLIAMS
Filed: 3/11/2022 4:15 PM
Pgs-2

PJURY

CAUSE NO. 2021-73071

| | | |
|---|---|---|
| GENSETIX, INC. | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE BOARD OF REGENTS OF THE | § | |
| UNIVERSITY OF TEXAS SYSTEM; | § | |
| THE UNIVERSITY OF TEXAS | § | |
| SYSTEM; and THE UNIVERSITY | § | |
| OF TEXAS M.D. ANDERSON | § | |
| CANCER CENTER | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |
| | § | |

## [PROPOSED] ORDER DENYING DEFENDANTS' PLEA TO THE JURISDICTION

On this day, the Court considered Defendants the Board of Regents of The University of Texas System ("Board of Regents"), The University of Texas System ("UTS"), and The University of Texas M.D. Anderson Cancer Center ("MD Anderson" collectively with Board of Regents and UTS, the "Defendants")'s Plea to the Jurisdiction

Having reviewed and considered Defendants' Plea to the Jurisdiction, the challenged pleadings, the non-movant's brief and evidence in opposition, and the arguments of counsel, the Court determined that Defendants' Plea to the Jurisdiction should be and is hereby **DENIED**.

~~Signed this _____ day of March, 2022.~~

Signed:
1/14/2025 _Robert K Schaffer_

JUDGE ROBERT SCHAFFER

771

Appendix Tab 2

License (CR:46-73)

# PATENT AND TECHNOLOGY LICENSE AGREEMENT

This AGREEMENT ("AGREEMENT") is made on this _8th_ day of _September_, 200_8_, by and between THE BOARD OF REGENTS ("BOARD") of THE UNIVERSITY OF TEXAS SYSTEM ("SYSTEM"), an agency of the State of Texas, whose address is 201 West 7th Street, Austin, Texas 78701, on behalf of THE UNIVERSITY OF TEXAS M. D. ANDERSON CANCER CENTER ("UTMDACC"), a component institution of SYSTEM, and Alex Mirrow, a United States citizen, residing at ███████████████ ███████████████ ("LICENSEE").

## RECITALS

A.     BOARD owns certain PATENT RIGHTS and TECHNOLOGY RIGHTS related to LICENSED SUBJECT MATTER developed at UTMDACC.

B.     BOARD, through UTMDACC, desires to have the LICENSED SUBJECT MATTER developed in the LICENSED FIELD and used for the benefit of LICENSEE, BOARD, SYSTEM, UTMDACC, the inventor(s), and the public as outlined in BOARD's Intellectual Property Policy.

C.     LICENSEE wishes to obtain a license from BOARD to practice LICENSED SUBJECT MATTER.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the parties agree as follows:

## I.     EFFECTIVE DATE

1.1     This AGREEMENT is effective as of the date written above ("EFFECTIVE DATE") which is the date fully executed by all parties.

Tract Manager # 3000. 17684C

## II. DEFINITIONS

As used in this AGREEMENT, the following terms have the meanings indicated:

2.1 **AFFILIATE** means any business entity more than fifty percent (50%) owned by LICENSEE, provided that LICENSEE is itself a business entity to which this AGREEMENT has been properly assigned in accordance with Section 12.1.

2.2 **LICENSED FIELD** means all fields of use.

2.3 **LICENSED PRODUCTS** means any product or service sold by LICENSEE or its AFFILIATES or their sublicensees comprising LICENSED SUBJECT MATTER pursuant to this AGREEMENT.

2.4 **LICENSED SUBJECT MATTER** means inventions and discoveries covered by PATENT RIGHTS or TECHNOLOGY RIGHTS within LICENSED FIELD.

2.5 **LICENSED TERRITORY** means worldwide.

2.6 **NET SALES** means the gross revenues received by LICENSEE or its AFFILIATES or their sublicensees from a SALE less sales discounts actually granted, sales and/or use taxes actually paid, import and/or export duties actually paid, outbound transportation actually prepaid or allowed, and amounts actually allowed or credited due to returns (not exceeding the original billing or invoice amount), all as recorded by LICENSEE or its AFFILIATES or their sublicensees in their official books and records in accordance with generally accepted accounting practices and consistent with their published financial statements and/or regulatory filings, if any, with the United States Securities and Exchange Commission.



2.7 **PATENT RIGHTS** means BOARD's rights in the information or discoveries described in invention disclosures, or claimed in any patents and/or patent applications, whether domestic or foreign, as identified in Exhibit I attached hereto, and all divisionals, continuations, continuations-in-part (to the extent the claims of such continuations-in-part are entitled to claim priority to the aforesaid patents and/or patent applications identified in Exhibit I), reissues, reexaminations or extensions of the patents and/or patent applications identified in Exhibit I, and any letters patent, domestic or foreign that issue thereon.

2.8 **PHASE I CLINICAL STUDY** means: (a) that portion of the drug development and review process which provides for the initial introduction of a LICENSED PRODUCT and/or an investigational new drug into human subjects, as more specifically defined by the rules and regulations of the United States Food and Drug Administration or any successor agency thereto ("FDA"), including 21 C.F.R. § 312.21 or any future revisions or substitutes therefor; or (b) a similar clinical study in any national jurisdiction other than the United States.

2.9 **PHASE II CLINICAL STUDY** means: (a) that portion of the drug development and review process which provides for early controlled clinical studies conducted to obtain preliminary data on the effectiveness of a LICENSED PRODUCT and/or an investigational new drug for a particular indication, as more specifically defined by the rules and regulations of the FDA, including 21 C.F.R. § 312.21 or any future revisions or substitutes therefor; or (b) a similar clinical study in any national jurisdiction other than the United States.

2.10 **PHASE III CLINICAL STUDY** means: (a) that portion of the drug development and review process in which expanded clinical studies are conducted to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of a LICENSED PRODUCT and/or an investigational new drug, as more specifically defined by the rules and regulations of the FDA, including 21 C.F.R. § 312.21 or any future revisions or substitutes therefor; or; (b) a similar clinical study in any national jurisdiction other than the United States.

2.11 **SALE** or **SOLD** means the transfer or disposition of a LICENSED PRODUCT for value to a party other than LICENSEE, an AFFILIATE or a ROYALTY-FREE PRACTITIONER. As used herein, "ROYALTY-FREE PRACTITIONER" means UTMDACC and the following individuals: Elizabeth Shpall M.D. and Krishna Komanduri, M.D. ("PHYSICIAN INVENTORS"), and any partner or associate who practices medicine with one or more of the PHYSICIAN INVENTORS, but with respect to such partner or associate, only for such time as he/she is engaged in a bona fide medical practice with one or more of the PHYSICIAN INVENTORS.

2.12 **TECHNOLOGY RIGHTS** means BOARD's rights in any technical information, know-how, processes, procedures, compositions, devices, methods, formulae, protocols, techniques, software, designs, drawings or data created by the inventor(s) listed in Exhibit I at UTMDACC before the EFFECTIVE DATE, which are not claimed in PATENT RIGHTS but that are necessary for practicing PATENT RIGHTS.

## III.   LICENSE

3.1   BOARD, through UTMDACC, hereby grants to LICENSEE a royalty-bearing, exclusive license under LICENSED SUBJECT MATTER to manufacture, have manufactured, use, import, offer to sell and/or sell LICENSED PRODUCTS within LICENSED TERRITORY for use within LICENSED FIELD.   This grant is subject to Sections 14.2 and 14.3 hereinbelow, the payment by LICENSEE to UTMDACC of all consideration as provided herein, the timely payment of all amounts due under any related sponsored research agreement between UTMDACC and LICENSEE in effect during this AGREEMENT, and is further subject to the following rights retained by BOARD and UTMDACC to:

(a)   Publish the general scientific findings from research related to LICENSED SUBJECT MATTER, subject to the terms of ARTICLE XI–Confidential Information and Publication; and

(b)   Use LICENSED SUBJECT MATTER for research, teaching, patient care, and other academically-related purposes; and

(c)   Transfer LICENSED SUBJECT MATTER to academic or research institutions for non-commercial research use.

3.2   LICENSEE may extend the license granted herein to any AFFILIATE provided that the AFFILIATE consents in writing to be bound by this AGREEMENT to the same extent as LICENSEE.   LICENSEE agrees to deliver such contract to UTMDACC within thirty (30) calendar days following execution thereof.



3.3 LICENSEE may grant sublicenses under LICENSED SUBJECT MATTER consistent with the terms of this AGREEMENT provided that LICENSEE is responsible for its sublicensees relevant to this AGREEMENT, and for diligently collecting all amounts due LICENSEE from sublicensees. If a sublicensee pursuant hereto becomes bankrupt, insolvent or is placed in the hands of a receiver or trustee, LICENSEE, to the extent allowed under applicable law and in a timely manner, agrees to use commercially reasonable efforts to collect all consideration owed to LICENSEE and to have the sublicense agreement confirmed or rejected by a court of proper jurisdiction.

3.4 LICENSEE must deliver to UTMDACC a true and correct copy of each sublicense granted by LICENSEE, and any modification or termination thereof, within thirty (30) calendar days after execution, modification, or termination.

3.5 If this AGREEMENT is terminated pursuant to ARTICLE XIII-Term and Termination, BOARD and UTMDACC agree to accept as successors to LICENSEE, existing sublicensees in good standing at the date of termination provided that each such sublicensee consents in writing to be bound by all of the terms and conditions of this AGREEMENT.

## IV. CONSIDERATION, PAYMENTS AND REPORTS

4.1 In consideration of rights granted by BOARD to LICENSEE under this AGREEMENT, LICENSEE agrees to pay UTMDACC the following:

(a) All out-of-pocket expenses in excess of ████████ incurred by UTMDACC in filing, prosecuting, enforcing and maintaining PATENT RIGHTS, and all such future expenses incurred by UTMDACC, for so long as, and in such countries as



this AGREEMENT remains in effect ("PATENT EXPENSES"). UTMDACC will invoice LICENSEE after the AGREEMENT has been fully executed by all parties for PATENT EXPENSES incurred as of that time and on a quarterly basis thereafter. The invoiced amounts will be due and payable by LICENSEE within thirty (30) calendar days of invoice; and

(b)     A nonrefundable license documentation fee in the amount of ███████ This fee will not reduce the amount of any other payment provided for in this ARTICLE IV, and is due and payable within thirty (30) calendar days after the AGREEMENT has been fully executed by all parties and LICENSEE has received an invoice for the amount from UTMDACC; and

(c)     Nonrefundable annual maintenance fees ("Annual Maintenance Fee(s)") in the following amounts, each such Annual Maintenance fee due and payable (without invoice) within thirty (30) calendar days of each anniversary of the EFFECTIVE DATE until the first SALE. The Annual Maintenance Fee will not reduce the amount of any other payment provided for in this ARTICLE IV:

(1)     ████████ due and payable within thirty (30) calendar days of the first anniversary of the EFFECTIVE DATE;

(2)     ████████ due and payable within thirty (30) calendar days of the second anniversary of the EFFECTIVE DATE;

(3)     ████████ due and payable within thirty (30) calendar days of the third anniversary of the EFFECTIVE DATE;

52

(4) ███████ due and payable within thirty (30) calendar days of the fourth anniversary of the EFFECTIVE DATE;

(5) ███████ due and payable within thirty (30) calendar days of the fifth anniversary of the EFFECTIVE DATE; and

(6) ███████ due and payable within thirty (30) calendar days of the sixth anniversary of the EFFECTIVE DATE and every anniversary of the EFFECTIVE DATE occurring thereafter until the first SALE; and

(d) A running royalty equal to ███████████ of NET SALES; and

(e) The following one-time milestone payments, regardless of whether the milestone is achieved by LICENSEE, a sublicense or AFFILIATE:

(1) ███████ due and payable to UTMDACC at the conclusion of a PHASE II CLINICAL STUDY for a LICENSED PRODUCT; and

(2) ███████ due and payable to UTMDACC at the conclusion of a PHASE III CLINICAL STUDY for a LICENSED PRODUCT;

Each of the foregoing milestone payments shall be made by LICENSEE to UTMDACC (without invoice) within thirty (30) calendar days of achieving the milestone event and shall not reduce the amount of any other payment provided for in this ARTICLE IV; and

(f) The following percentage of all consideration, other than research and development money and royalties for NET SALES made by a sublicensee, received by LICENSEE from either (i) any sublicensee pursuant to Sections 3.3 and 3.4 hereinabove, or (ii) any assignee pursuant to Section 12.1 hereinbelow (in

consideration for UTMDACC allowing the assignment), including but not limited to, up-front payments, marketing, distribution, franchise, option, license, or documentation fees, bonus, equity securities, and milestone payments (provided, however, that with respect to any milestone payment received by LICENSEE for the milestones specified in Section 4.1(e)(1) and (2), above, the percentages shall only apply to the extent such milestone payment received by LICENSEE exceeds the applicable amount specified under Section 4.1.e (1) or (2)):

(1)    with respect to consideration received from a sublicense:

      (a)  ██████████ of all such consideration accruing or received prior to the second anniversary of the EFFECTIVE DATE; and

      (b)  ██████████ of all such consideration accruing and received on or after the second anniversary of the EFFECTIVE DATE; and

(2)    with respect to consideration received from an ARM'S LENGTH ASSIGNMENT: ██████████ of all consideration received from an assignee up to a total payment to UTMDACC of ██████ regardless of when the consideration accrues or is received. As used in this Section, an ARM'S LENGTH ASSIGNMENT means any assignment of this AGREEMENT to a third party, other than to a company in which LICENSEE has a controlling ownership interest or to an AFFILIATE of LICENSEE.

4.2    Unless otherwise provided, all such payments are payable within thirty (30) calendar days after March 31, June 30, September 30, and December 31 of each year during the term of this AGREEMENT, at which time LICENSEE will also deliver to UTMDACC a

true and accurate report, giving such particulars of the business conducted by LICENSEE, its AFFILIATES and its sublicensees, if any exist, during the preceding three (3) calendar months under this AGREEMENT as necessary for UTMDACC to account for LICENSEE's payments hereunder. This report will include pertinent data, including, but not limited to:

(a)     the accounting methodologies used to account for and calculate the items included in the report and any differences in such accounting methodologies used by LICENSEE since the previous report; and

(b)     a list of LICENSED PRODUCTS produced for the three (3) preceding calendar months; and

(c)     the total quantities of LICENSED PRODUCTS produced; and

(d)     the total SALES; and

(e)     the calculation of NET SALES; and

(f)     the royalties so computed and due UTMDACC; and

(g)     all consideration received from each sublicensee or assignee and payments due UTMDACC; and

(h)     all other amounts due UTMDACC herein.

Simultaneously with the delivery of each such report, LICENSEE agrees to pay UTMDACC the amount due, if any, for the period of such report. These reports are required even if no payments are due; provided, however, prior to the first SALE, such reports shall only be due annually, within thirty (30) days of the close of the calendar year.

4.3 During the term of this AGREEMENT and for one (1) year thereafter, LICENSEE agrees to keep complete and accurate records of its, its AFFILIATES' and its sublicensees' SALES and NET SALES in sufficient detail to enable the royalties and other payments due hereunder to be determined. LICENSEE agrees to permit UTMDACC or its representatives, at UTMDACC's expense, and upon reasonable notice to LICENSEE to periodically examine LICENSEE's books, ledgers, and records during regular business hours for the purpose of and to the extent necessary to verify any report required under this AGREEMENT. If any amounts due UTMDACC are determined to have been underpaid in an amount equal to or greater than five percent (5%) of the total amount due during the period so examined, then LICENSEE will pay the cost of the examination plus accrued interest at one percent (1%) above the prime rate reported in the *Wall Street Journal* on the date the payment was due or the highest allowable rate, whichever is less.

4.4 Within thirty (30) calendar days following each anniversary of the EFFECTIVE DATE, LICENSEE will deliver to UTMDACC a written progress report as to LICENSEE's (and any AFFILIATE's and sublicensee's) efforts and accomplishments during the preceding year in diligently commercializing LICENSED SUBJECT MATTER in the LICENSED TERRITORY and LICENSEE's (and AFFILIATE's and sublicensees') commercialization plans for the upcoming year.

4.5 All amounts payable hereunder by LICENSEE will be paid in United States funds without deductions for taxes, assessments, fees, or charges of any kind. Checks are to be made payable to The University of Texas M. D. Anderson Cancer Center, and sent by

United States mail to Box 4390, Houston, Texas 77210, Attention: Grants and Contracts

or by wire transfer to:

JPMorgan Chase Bank, N.A.
910 Travis
Houston, Texas 77002

███████████████████████████████

REFERENCE: include title and EFFECTIVE DATE of AGREEMENT and type of payment (e.g., license documentation fee, milestone payment, royalty [including applicable patent/application identified by MDA reference number and patent number or application serial number], or maintenance fee, etc.).

4.6     No payments due or royalty rates owed under this AGREEMENT will be reduced as the result of co-ownership of LICENSED SUBJECT MATTER by BOARD and another party, including, but not limited to, LICENSEE.

## V.     SPONSORED RESEARCH

5.1     LICENSEE agrees to negotiate in good faith with UTMDACC the terms of a Sponsored Research Agreement, whereby LICENSEE shall provide the funding set forth in Section 13.2(b) below to UTMDACC within one (1) year of the EFFECTIVE DATE.

## VI.     PATENTS AND INVENTIONS

6.1     If after consultation with LICENSEE both parties agree that a new patent application should be filed for LICENSED SUBJECT MATTER, UTMDACC will prepare and file appropriate patent applications, and LICENSEE will pay the cost of searching, preparing, filing, prosecuting and maintaining same. It is understood and agreed that UTMDACC shall not be obligated to file any patent application unless LICENSEE has timely made all payments owed to UTMDACC under this AGREEMENT and LICENSEE is not in

default of its obligations under Section 5.1 of the AGREEMENT. If LICENSEE notifies UTMDACC that it does not intend to pay the cost of an application in a national political jurisdiction, or if LICENSEE does not respond or make an effort to agree with UTMDACC on the disposition of rights of the subject invention in a national political jurisdiction, then UTMDACC may file such application at its own expense and LICENSEE's rights to such invention under this AGREEMENT shall terminate in their entirety in such national political jurisdiction. UTMDACC will provide LICENSEE with a copy of the application for which LICENSEE has paid the cost of filing, as well as copies of any documents received or filed during prosecution thereof. The parties agree that they share a common legal interest to get valid enforceable patents and that LICENSEE will keep all privileged information received pursuant to this Section confidential.

## VII. INFRINGEMENT BY THIRD PARTIES

7.1 LICENSEE, at its expense, must enforce any patent exclusively licensed hereunder against infringement by third parties and is entitled to retain recovery from such enforcement. After reimbursement of LICENSEE's reasonable legal costs and expenses related to such recovery, LICENSEE agrees to pay UTMDACC either:



LICENSEE must notify UTMDACC in writing of any potential infringement within thirty (30) calendar days of knowledge

thereof. If LICENSEE does not file suit against a substantial infringer within six (6) months of knowledge thereof, then BOARD or UTMDACC may, at its sole discretion, enforce any patent licensed hereunder ("Enforced Patent") on behalf of itself and LICENSEE, with UTMDACC retaining all recoveries from such enforcement, and/or reduce the license granted hereunder to non-exclusive or terminate the license with respect to the Enforced Patent.

7.2 In any suit or dispute involving an infringer, the parties agree to cooperate fully with each other. At the request and expense of the party bringing suit, the other party will permit access during regular business hours, to all relevant personnel, records, papers, information, samples, specimens, and the like in its possession.

## VIII. PATENT MARKING

8.1 LICENSEE agrees that all packaging containing individual LICENSED PRODUCT(S), documentation therefor, and, when possible, actual LICENSED PRODUCT(S) sold by LICENSEE, AFFILIATES, and/or sublicensees of LICENSEE will be permanently and legibly marked with the number of any applicable patent(s) licensed hereunder in accordance with each country's patent laws, including Title 35, United States Code, to the extent such marking is necessary or required to fully preserve PATENT RIGHTS in each such country.

## IX. INDEMNIFICATION AND INSURANCE

9.1 LICENSEE agrees to hold harmless and indemnify BOARD, SYSTEM, UTMDACC, their Regents, officers, employees, students and agents from and against any claims, demands, or causes of action whatsoever, costs of suit and reasonable attorney's fees,

including without limitation, those costs arising on account of any injury or death of persons or damage to property caused by, or arising out of, or resulting from, the exercise or practice of the rights granted hereunder by LICENSEE, its officers, its AFFILIATES or their officers, employees, agents or representatives.

9.2   In no event shall BOARD, SYSTEM or UTMDACC be liable for any indirect, special, consequential or punitive damages (including, without limitation, damages for loss of profits or expected savings or other economic losses, or for injury to persons or property) arising out of, or in connection with, this AGREEMENT or its subject matter, regardless of whether BOARD, SYSTEM or UTMDACC knows or should know of the possibility of such damages.

9.3   Beginning at the time when any LICENSED SUBJECT MATTER is being distributed or sold (including for the purpose of obtaining regulatory approvals) by LICENSEE, an AFFILIATE, or by a sublicensee, LICENSEE shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than ███████ per incident and ███████ annual aggregate, and LICENSEE shall use reasonable efforts to have the BOARD, SYSTEM, UTMDACC, their Regents, officers, employees, students and agents named as additional insureds. Such commercial general liability insurance shall provide: (i) product liability coverage; (ii) broad form contractual liability coverage for LICENSEE's indemnification under this AGREEMENT; and (iii) coverage for litigation costs. The minimum amounts of insurance coverage required herein shall not be construed to create a limit of LICENSEE's liability with respect to its indemnification under this AGREEMENT.

9.4 LICENSEE shall provide UTMDACC with written evidence of such insurance within thirty (30) calendar days of its procurement. Additionally, LICENSEE shall provide UTMDACC with written notice of at least fifteen (15) calendar days prior to the cancellation, non-renewal or material change in such insurance.

9.5 LICENSEE shall maintain such commercial general liability insurance beyond the expiration or termination of this AGREEMENT during: (i) the period that any LICENSED SUBJECT MATTER developed pursuant to this AGREEMENT is being commercially distributed or sold by LICENSEE, an AFFILIATE or by a sublicensee or agent of LICENSEE; and (ii) the five (5) year period immediately after such period.

## X. USE OF BOARD AND UTMDACC'S NAME

10.1 LICENSEE will not use the name of (or the name of any employee of) UTMDACC, SYSTEM or BOARD in any advertising, promotional or sales literature, on its Web site, or for the purpose of raising capital without the advance express written consent of BOARD secured through:

The University of Texas
M. D. Anderson Cancer Center
Legal Services, Unit 0537
P.O. Box 301439
Houston, TX 77230-1439
ATTENTION: Lori Stiffler
Email: ldstiffl@mdanderson.org

Notwithstanding the above, LICENSEE may use the name of (or name of employee of) UTMDACC, SYSTEM or BOARD in routine business correspondence, or as needed in appropriate regulatory submissions without express written consent.

## XI. CONFIDENTIAL INFORMATION AND PUBLICATION

11.1 UTMDACC and LICENSEE each agree that all information contained in documents marked "confidential" and forwarded to one by the other (i) are to be received in strict confidence, (ii) are to be used only for the purposes of this AGREEMENT, and (iii) will not be disclosed by the recipient party (except as required by law or court order), its agents or employees without the prior written consent of the disclosing party, except to the extent that the recipient party can establish by competent written proof that such information:

(a) was in the public domain at the time of disclosure; or

(b) later became part of the public domain through no act or omission of the recipient party, its employees, agents, successors or assigns; or

(c) was lawfully disclosed to the recipient party by a third party having the right to disclose it; or

(d) was already known by the recipient party at the time of disclosure; or

(e) was independently developed by the recipient party without use of the disclosing party's confidential information; or

(f) is required by law or regulation to be disclosed.

11.2 Each party's obligation of confidence hereunder will be fulfilled by using at least the same degree of care with the disclosing party's confidential information as it uses to protect its own confidential information, but always at least a reasonable degree of care. This obligation will exist while this AGREEMENT is in force and for a period of three (3) years thereafter.

11.3 UTMDACC reserves the right to publish the general scientific findings from research related to LICENSED SUBJECT MATTER, with due regard to the protection of LICENSEE's confidential information. UTMDACC will submit the manuscript of any proposed publication to LICENSEE at least thirty (30) calendar days before publication, and LICENSEE shall have the right to review and comment upon the publication in order to protect LICENSEE's confidential information. Upon LICENSEE's request, publication may be delayed up to sixty (60) additional calendar days to enable LICENSEE to secure adequate intellectual property protection of LICENSEE's confidential information that would otherwise be affected by the publication.

## XII. ASSIGNMENT

12.1 Except in connection with a one-time assignment of this AGREEMENT to a company that is an AFFILIATE of LICENSEE, or to a company in which LICENSEE has a controlling ownership interest, this AGREEMENT may not be assigned by LICENSEE without the prior written consent of UTMDACC, which will not be unreasonably withheld.

## XIII. TERM AND TERMINATION

13.1 Subject to Sections 13.3 and 13.4 hereinbelow, the term of this AGREEMENT is from the EFFECTIVE DATE to the full end of the term or terms for which PATENT RIGHTS have not expired, or if only TECHNOLOGY RIGHTS are licensed and no PATENT RIGHTS are applicable, for a term of fifteen (15) years.

13.2 (a) Any time after three (3) years from the EFFECTIVE DATE, BOARD or UTMDACC have the right to terminate this license in any national political jurisdiction within the

63

LICENSED TERRITORY if LICENSEE, within ninety (90) calendar days after receiving written notice from UTMDACC of the intended termination, fails to provide written evidence satisfactory to UTMDACC that LICENSEE or its sublicensee(s) has commercialized or is actively and effectively attempting to commercialize a licensed invention in such jurisdiction(s). The following definitions apply to Section 13.2: (a) "commercialized" means having SALES in such jurisdiction; and (b) "actively and effectively attempting to commercialize" means having an effective, ongoing and active research, development, manufacturing, marketing or sales program as appropriate, directed toward obtaining regulatory approval, and/or production and/or SALES in any jurisdiction, and has provided plans acceptable to UTMDACC, in its sole discretion, to commercialize licensed inventions in the jurisdiction(s) that UTMDACC intends to terminate.

(b) In addition, BOARD or UTMDACC have the right to terminate this AGREEMENT if LICENSEE does not: (i) sponsor ███████ for research at UTMDACC directed towards further enablement of the LICENSED SUBJECT MATTER, and (ii) commence a PHASE I CLINICAL STUDY for a LICENSED PRODUCT directed to the treatment of prostate cancer within the earlier of four (4) years from the EFFECTIVE DATE or two (2) years of the completion of a UTMDACC Phase I/IIa Clinical Study for AML ("DUE DATE"), provided that LICENSEE may obtain a six (6) month extension of the DUE DATE (up to a maximum of four (4) extensions) upon payment of ███████ prior to each applicable DUE DATE. It is understood that time is of the essence with respect

to such extension payments, and as such, extension payments shall not be eligible for any of the "cure" periods specified in Section 13.3. .

13.3    Subject to any rights herein which survive termination, this AGREEMENT will earlier terminate in its entirety:

(a)    automatically, if LICENSEE becomes bankrupt or insolvent and/or if the business of LICENSEE shall be placed in the hands of a receiver, assignee, or trustee, whether by voluntary act of LICENSEE or otherwise; or

(b)    upon sixty (60) calendar days written notice from UTMDACC, if LICENSEE breaches or defaults on the payment or report obligations of ARTICLE IV, or use of name obligations of ARTICLE X, unless, before the end of the such sixty (60)-calendar day notice period, LICENSEE has cured the default or breach to UTMDACC's satisfaction, and so notifies UTMDACC, stating the manner of the cure; or

(c)    upon ninety (90) calendar days written notice from UTMDACC if LICENSEE breaches or defaults on any other obligation under this AGREEMENT, unless, before the end of the such ninety (90) calendar-day notice period, LICENSEE has cured the default or breach to UTMDACC's satisfaction and so notifies UTMDACC, stating the manner of the cure; or

(d)    at any time by mutual written agreement between LICENSEE and UTMDACC upon one hundred eighty (180) calendar days written notice to all parties and subject to any terms herein which survive termination; or



(e) upon ninety (90) calendar days written notice from LICENSEE to UTMDACC , provided that LICENSEE is not in default or breach on any of its obligations under the AGREEMENT, and subject to any terms herein which survive termination; or

(f) if Section 13.2 or 15.9 is invoked; or

(g) if LICENSEE has defaulted or been late on its payment obligations pursuant to the terms of this AGREEMENT on any two (2) occasions in a twelve (12) month period.

13.4 Upon termination of this AGREEMENT:

(a) nothing herein will be construed to release either party of any obligation maturing prior to the effective date of the termination; and

(b) LICENSEE covenants and agrees to be bound by the provisions of ARTICLES IX (Indemnification and Insurance), X (Use of Board and UTMDACC's Name) and XI (Confidential Information and Publication) of this AGREEMENT; and

(c) LICENSEE may, for a period of one year after the effective date of the termination, sell all LICENSED PRODUCTS and parts therefor that it has on hand at the date of termination, if LICENSEE pays the earned royalty thereon and any other amounts due pursuant to ARTICLE IV of this AGREEMENT; and

(d) Subject to Section 13.4(c), LICENSEE agrees to cease and desist any use and all SALE of the LICENSED SUBJECT MATTER and LICENSED PRODUCTS upon termination of this AGREEMENT.

## XIV.  WARRANTY: SUPERIOR-RIGHTS

14.1 Except for the rights, if any, of the Government of the United States of America as set forth below, BOARD represents and warrants its belief that (a) it is the owner of the entire right, title, and interest in and to LICENSED SUBJECT MATTER, (b) it has the sole right to grant licenses thereunder, and (c) it has not knowingly granted licenses thereunder to any other entity that would restrict rights granted hereunder except as stated herein.

14.2 LICENSEE understands that the LICENSED SUBJECT MATTER may have been developed under a funding agreement with the Government of the United States of America ("Government") and, if so, that the Government may have certain rights relative thereto. This AGREEMENT is explicitly made subject to the Government's rights under any such agreement and any applicable law or regulation. To the extent that there is a conflict between any such agreement, applicable law or regulation and this AGREEMENT, the terms of such Government agreement, applicable law or regulation shall prevail. LICENSEE agrees that LICENSED PRODUCTS used or SOLD in the United States will be manufactured substantially in the United States, unless a written waiver is obtained in advance from the GOVERNMENT. LICENSEE will promptly advise UTMDACC if such a written waiver is requested and/or obtained.

14.3 LICENSEE understands and agrees that BOARD and UTMDACC, by this AGREEMENT, make no representation as to the operability or fitness for any use, safety, efficacy, approvability by regulatory authorities, time and cost of development, patentability, and/or breadth of the LICENSED SUBJECT MATTER. BOARD and

UTMDACC, by this AGREEMENT, also make no representation as to whether any patent covered by PATENT RIGHTS is valid or as to whether there are any patents now held, or which will be held, by others or by BOARD or UTMDACC in the LICENSED FIELD, nor do BOARD and UTMDACC make any representation that the inventions contained in PATENT RIGHTS do not infringe any other patents now held or that will be held by others or by BOARD.

14.4 LICENSEE, by execution hereof, acknowledges, covenants and agrees that LICENSEE has not been induced in any way by BOARD, SYSTEM, UTMDACC or employees thereof to enter into this AGREEMENT, and further warrants and represents that: (a) LICENSEE is entering into this AGREEMENT voluntarily; (b) LICENSEE has conducted sufficient due diligence with respect to all items and issues pertaining to this AGREEMENT; and (c) LICENSEE has adequate knowledge and expertise, or has used knowledgeable and expert consultants, to adequately conduct such due diligence, and agrees to accept all risks inherent herein.

## XV. GENERAL

15.1 This AGREEMENT constitutes the entire and only agreement between the parties for LICENSED SUBJECT MATTER and all other prior negotiations, representations, agreements and understandings are superseded hereby. No agreements altering or supplementing the terms hereof will be made except by a written document signed by both parties.

15.2 Any notice required by this AGREEMENT must be given by prepaid, first class, certified mail, return receipt requested, and addressed in the case of UTMDACC to:

The University of Texas M. D. Anderson Cancer Center
Office of Technology Commercialization
7515 S. Main, Suite 490, Unit 0510
Houston, Texas 77030
ATTENTION: Christopher C. Capelli, M.D.

or in the case of LICENSEE to:

Alex Mirrow

███████████████████

and

Irene Abrams

██████████████

or such other addresses as may be given from time to time under the terms of this notice provision.

15.3    LICENSEE must comply with all applicable federal, state and local laws and regulations in connection with its activities pursuant to this AGREEMENT. LICENSEE acknowledges that the LICENSED SUBJECT MATTER is subject to U. S. export control jurisdiction. LICENSEE agrees to comply with all applicable international and national laws that apply to the LICENSED SUBJECT MATTER, including U.S. Export Administration Regulations, as well as end-user, end-use, and destination restrictions applied by the United States.

15.4    This AGREEMENT will be construed and enforced in accordance with the laws of the United States of America and of the State of Texas, without regard to its conflict of law provisions. The Texas State Courts of Harris County, Texas (or, if there is exclusive federal jurisdiction, the United States District Court for the Southern District of Texas)

shall have exclusive jurisdiction and venue over any dispute arising out of this AGREEMENT, and LICENSEE consents to the jurisdiction and venue of such courts and hereby explicitly waives the rights to any other venue to which it might be entitled by cause of action, domicile or otherwise. Nothing in this AGREEMENT shall be deemed as a waiver by BOARD, SYSTEM or UTMDACC of its sovereign immunity.

15.5    Failure of BOARD or UTMDACC to enforce a right under this AGREEMENT will not act as a waiver of right or the ability to later assert that right relative to the particular situation involved.

15.6    Headings included herein are for convenience only and will not be used to construe this AGREEMENT.

15.7    If any part of this AGREEMENT is for any reason found to be unenforceable, all other parts nevertheless will remain enforceable.

15.8    In the event that LICENSEE brings an action before any court, agency or tribunal seeking to invalidate or otherwise challenge the enforceability of or BOARD's ownership of any patent included in the PATENT RIGHTS, then UTMDACC may immediately terminate this AGREEMENT upon written notice to LICENSEE. Additionally, LICENSEE will provide written notice to UTMDACC at least three (3) months prior to seeking to invalidate or challenge any patent under the PATENT RIGHTS. LICENSEE will include with such written notice an identification of all prior art it believes invalidates any claim of a patent under the PATENT RIGHTS and will promptly update such disclosure as LICENSEE becomes aware of additional prior art. Any dispute regarding the validity, enforceability or ownership of any patent included in the PATENT RIGHTS shall be

litigated in the courts located in Houston, Texas, and LICENSEE agrees not to challenge personal jurisdiction in that forum. To the extent that LICENSEE unsuccessfully challenges the validity or enforceability of any patent included in the PATENT RIGHTS, LICENSEE agrees to reimburse UTMDACC and BOARD for all costs and fees (including attorney's fees) paid by UTMDACC and BOARD in defending against such challenge. LICENSEE understands and agrees that, in the event LICENSEE successfully challenges the validity or enforceability of any patent included in the PATENT RIGHTS, all payments or other consideration made or otherwise provided by LICENSEE to UTMDACC prior to a final, non-appealable adjudication of invalidity and/or unenforceability shall be non-refundable. The obligations of this Section shall survive the expiration or termination of this AGREEMENT.

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized representatives

to execute this AGREEMENT.

BOARD OF REGENTS OF THE
UNIVERSITY OF TEXAS SYSTEM

By _____

John Mendelsohn, M.D.
President
The University of Texas
M. D. Anderson Cancer Center

Date: _____

THE UNIVERSITY OF TEXAS
M. D. ANDERSON CANCER CENTER

By _____

Leon Leach
Executive Vice President
The University of Texas
M. D. Anderson Cancer Center

Date: _____

Approved as to Content:

By _____

Christopher C. Capelli, M.D.
Vice President, Technology Based Ventures
Office of Technology Commercialization
M. D. Anderson Cancer Center

Date: _____

ALEX MIRROW

_____

Date: _____

Approved
as to form

NW/LS

Reviewed and Approved by
UTMDACC Legal Services for
UTMDACC Signature:

# EXHIBIT I

MDA 06-055, entitled "Doubly-Loaded Dendritic Cells" and MDA 06-0136, entitled "Doubly-Loaded Dendritic Cells"; William Decker, Ph.D., Elizabeth Shpall, M.D., Krishna Komanduri, M.D., and Dongxia Xing, Ph.D., Inventors.

Appendix Tab 3

First Amended Petition (CR:95-109)

CAUSE NO. 2021-73071

| | | |
|---|---|---|
| GENSETIX, INC. | § | IN THE DISTRICT COURT |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE BOARD OF REGENTS OF THE | § | |
| UNIVERSITY OF TEXAS SYSTEM; | § | |
| THE UNIVERSITY OF TEXAS | § | |
| SYSTEM; and THE UNIVERSITY | § | |
| OF TEXAS M.D. ANDERSON | § | |
| CANCER CENTER | § | |
| | § | **152nd JUDICIAL DISTRICT** |
| **Defendants.** | | |

## PLAINTIFF'S FIRST AMENDED PETITION

## SUMMARY OF CLAIMS

Plaintiff Gensetix, Inc. ("Gensetix") files this First Amended Petition and respectfully shows that it is entitled to just compensation from the University of Texas System ("UT") and M.D. Anderson Cancer Center ("MD Anderson") because UT and MD Anderson deprived Gensetix of its vested property rights that are conservatively worth at least $100,000,000.

This case is about UT and MD Anderson extracting hundreds of thousands of dollars in payments from Gensetix while secretly working with Baylor College of Medicine and Diakonos Research, Ltd. (and Dr. Decker as an officer of Diakonos) to deprive Gensetix of the benefits of its exclusive patent and technology license and the substantial investments Gensetix made in research and clinical trials to commercialize the inventions. UT and MD Anderson's motivation was money (not curing cancer).

Unbeknownst to Gensetix, UT and MD Anderson triple dipped—they received money from Gensetix (license fees), money from Baylor College of Medicine (patent assignment consideration), and money from Diakonos Research Ltd (investment in UT/MD Anderson for

1

95

salaries and expenses), all related to the same technology and inventions. As a result of UT and MD Anderson's triple-dealing, Gensetix lost the benefit of its bargain, lost the money it had paid, and ultimately lost its property rights. Meanwhile, UT and MD Anderson continue to benefit from their unconscionable scheme.

In 2014, Gensetix, a small company, bought an exclusive license to certain cancer-treating technologies that UT and MD Anderson had earlier sold to Alex Mirrow. Through its Office of Technology Commercialization, UT and MD Anderson had decided to sell it rather than invest their own money in development of the technology so they licensed the technology to Mirrow and required him to fund research. After taking assignment from Mirrow with UT's and MD Anderson's consent, Gensetix paid hundreds of thousands of dollars to UT and MD Anderson in periodic fees. As part of the deal, UT and MD Anderson agreed to "cooperate fully" in any suit or dispute involving an infringer of the licensed patents. UT and MD Anderson encouraged Gensetix to pay William Decker, one of the co-inventors on the patents from his time at MD Anderson, for his cooperation, and Gensetix complied. Per Decker's instruction, Gensetix made several payments to Decker totaling over $100,000 via non-profits he controlled to avoid having to share any of the money with his new employer, Baylor College of Medicine.

Meanwhile, Decker and Baylor College of Medicine continued working on "improvements" to the foundational technology licensed to Gensetix. Decker began working with a private company, Diakonos Research, Ltd., where he now works as part of "key management." *See* https://www.dcimmunotherapy.com/key-management. Recognizing the value of the technology Diakonos, Decker, and Baylor College of Medicine made plans to commercialize the technology but realized that Gensetix owned the exclusive rights to the core, foundational technology.

During this time, Gensetix was in regular communication with the Director of Active

Venture Investments at MD Anderson, Mr. Tom Lee. At the time, it seemed odd that Lee seemed intent on steering Gensetix toward working with a certain individual named Dan Faust. Gensetix was asked to introduce and sell its license rights to Faust's company, Diakonos Research, Ltd.

Gensetix, Faust, and Lee meet in Lee's office to discuss a possible deal. Gensetix did not know and was never informed that Faust and Lee knew each other. Nor did Gensetix know that Lee had helped Decker and Diakonos obtain a copy of Gensetix's confidential exclusive license agreement with UT and MD Anderson. After assuring Gensetix of its confidentiality and that it would not be disclosed, Lee eventually admitted that Decker in fact had it. Gensetix declined to negotiate a deal with Diakonos.

In 2016, Gensetix became concerned that Diakonos and Baylor College of Medicine were infringing its patents and using the technology that was the subject of Gensetix's exclusive patent license. As Gensetix was investigating, Diakonos, UT, MD Anderson, and Baylor College of Medicine were working on their own secret deal. In January 2017, Diakonos inadvertently published an announcement of their deal and then quickly took it down.



A few months later, upon completion of its pre-filing investigation, Gensetix filed suit against Baylor College of Medicine for infringement of its patents. This presented a problem for Diakonos, Baylor College of Medicine, Decker, UT and MD Anderson. They had a quiet deal by which UT and MD Anderson received millions, Diakonos would commercialize, and Decker would profit from all sides. But Gensetix's lawsuit threatened to expose the infringing work Decker had been doing on "improvements" that would steer millions to UT and MD Anderson through Diakonos. They had to stop Gensetix.

So UT and MD Anderson refused to "cooperate fully" in the Gensetix lawsuit against Baylor College of Medicine and Diakonos. Indeed, UT MD Anderson refused to participate in any way in the lawsuit, breaching a fundamental provision of the exclusive license agreement. Judge Newman's concurrence in *Gensetix, Inc. v. The Board of Regents of the University of Texas System*, Case No. 2019-1424 (Fed. Cir. July 24, 2020) summarizes the exceptional conduct:

> The University now refuses such cooperation, by refusing to be named as a party to the suit, thereby preventing enforcement of the patents—although the License Agreement requires Gensetix to enforce the patents. The University not only violates its agreement to "cooperate fully," but also deprives its licensee of the agreed upon exclusivity. The University achieves this result by invoking the Eleventh Amendment.
>
> This is not a matter of shielding the State from the "indignity" of judicial process, as in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996). When a State enters into commerce, it accedes to the rules of commerce. *See White v. Massachusetts Council of Const. Employers, Inc.*, 460 U.S. 204, 207 (1983) ("There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–47 (1980))).
>
> I do not share the majority's conclusion that the Eleventh Amendment shields the University from compliance with its contractual obligation to "cooperate fully" with its exclusive licensee, Gensetix, in enforcing these patents against infringers.[3]

4

Although UT and MD Anderson had contractually required Gensetix to "enforce any patent . . . against infringement by third parties," at every turn, UT and MD Anderson adopted Baylor's positions adverse to Gensetix. Indeed, it is difficult to discern any difference in arguments between Baylor College of Medicine and MD Anderson. But UT and MD Anderson had 1.63 million reasons to thwart, harass, threaten, and try to bankrupt Gensetix, clearing the way for their three-way deal.

The final step in UT and MD Anderson's plan: they sold Gensetix's property to Baylor College of Medicine. UT and MD Anderson wanted two things: money and for the research and clinical trials to be funded. Because Gensetix was lured into believing the provisions of the exclusive patent license would be honored, UT and MD Anderson obtained both things from Gensetix. But when it came time for UT and MD Anderson to honor their obligations, they refused, purportedly terminated the license, and sold Gensetix's property to Baylor College of Medicine.

Gensetix sues for just compensation which is "the full monetary equivalent of the property taken[,]"[1] based on the property's "highest and best use."[2] More specifically, Gensetix is entitled to the "market value of the property on the date it was appropriated[,]"[3] which is the "amount that a willing buyer would actually pay a willing seller."[4]

A willing buyer, without coercion, offered Gensetix $100,000,000 in exchange for a controlling stake in its vested property rights. Gensetix can no longer accept offers commensurate with the value of its property because UT and MD Anderson destroyed the property, then turned around and sold it to Baylor College of Medicine.

---

[1] *Almota Farmers Elevatory & Whse. Co. v. United States*, 409 U.S. 470, 473 (1973).
[2] *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002).
[3] *Religious of the Sacred Heart v. Houston*, 836 S.W.2d 606, 618 (Tex. 1992) (Cornyn, J., concurring).
[4] *Hlavinka v. HSC Pipeline P'ship LLC*, 605 S.W.3d 819, 837 (Tex. App.—Houston [1st Dist.] 2020, pet. filed).

Their intentional, egregious misconduct violates the Texas Constitution, and Gensetix is entitled to the remedies for which it pleads.

## I. PARTIES

1. Gensetix, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

2. The University of Texas System and the Board of Regents of the University of Texas System ("UT") is a state agency. The Board of Regents has broad powers to govern, operate, support, and maintain the University of Texas System, including the University of Texas M.D. Anderson Cancer Center. The Board of Regents and the University of Texas System have answered in this suit and may be served through their counsel of record.

3. The University of Texas M.D. Anderson Cancer Center ("MD Anderson") is a constituent entity of the University of Texas System, located in Houston, Texas. MD Anderson have answered in this suit and may be served through their counsel of record.

## II. DISCOVERY CONTROL PLAN

4. Gensetix intends to conduct discovery under Level 3 of the Texas Rules of Civil Procedure. Pursuant to Rule 47, Plaintiffs seeks monetary relief in an amount over $1,000,000.00 (one million dollars). Damages sought are within the jurisdictional limits of the District Court in which this case is filed.

## III. JURISDICTION

5. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements. The Court has personal jurisdiction over Defendants because they are doing business in Texas with operations located in Houston, Harris County, Texas.

6. The Court has jurisdiction over the lawsuit under Tex. Const. Art. I, Sec. 17 and

6

100

Tex. Civ. Prac. & Rem. Code § 5.001.

7.    The Court also has jurisdiction over the lawsuit because UT and MD Anderson have waived any claim to sovereign immunity by their egregious conduct, engaged in commerce by signing a contract with Gensetix, and expressly breaching their agreement.

## IV.    VENUE

8.    Venue lies properly in this Court because a substantial part of the claims alleged in this action arose in Harris County, Texas. The License Agreement includes an exclusive jurisdiction and venue provision for the Texas State Courts of Harris County, Texas and UT and MD Anderson explicitly waived the rights to any other venue to which they may be entitled by cause of action, domicile or otherwise. Venue in the Texas State Courts of Harris County, Texas is mandatory because the action arises from a major transaction and UT and MD Anderson agreed in writing that a suit arising from the transaction must be brought in Texas State Courts of Harris County, Texas.

## V.    CONDITIONS PRECEDENT

9.    All conditions precedent to Gensetix's claims for relief have been performed or have occurred.

## VI.    JURY DEMAND

10.    Gensetix demands a jury trial and tenders the appropriate fee with this Petition.

## VII.    DAMAGES AND RELIEF

11.    The damages sought are within the jurisdictional limits of the Court.

12.    Gensetix seeks monetary relief over $1,000,000.

## VIII.    FACTUAL BACKGROUND

**A.    The Technology, UT, and MD Anderson**

7

101

13. UT and MD Anderson owned the rights in valuable cancer treating innovations. UT and MD Anderson had little interest in funding and developing the promising methods for curing cancer developed at MD Anderson. UT and MD Anderson granted an exclusive patent license covering any resulting United States patents on certain inventions to Alex Mirrow.

14. When a patent license is an exclusive transfer of "all substantial rights [it] is tantamount to an assignment of those patents to the exclusive licensee[.]" *Alfred E. Mann Foundation for Science v. Cochlear Corp.*, 604 F.3d 1354, 1358-59 (Fed. Cir. 2010). Thus, Mirrow was effectively the assignee of any exclusive rights granted by the United States Patent & Trademark Office arising from the applications embracing the inventions.

15. Two United States patents issued: U.S. Patent Nos. 8,728,806 ("'806 Patent") and 9,333,248 ("'248 Patent").

**B.    Gensetix, its performance under the exclusive license, and the beneficiaries of Gensetix' performance.**

16. In 2014, Mirrow conveyed his exclusive license to Gensetix.

17. Gensetix is the successor-in-interest corporation to a Texas limited liability company that was formed by an individual interested in supporting cancer treatment.

18. The License terms required Gensetix to pay all out-of-pocket expenses in excess of $10,000 incurred by MD Anderson in filing, prosecuting, enforcing and maintaining patent rights, documentation fees, annual maintenance fees, running royalties, milestone payments, and a percentage of all consideration received by Gensetix (for all time).

19. Gensetix was also required to provide funds to sponsor research and commence clinical studies and buy insurance for the benefit and protection of UT and MD Anderson.

20. In justified reliance upon the contractual obligations owed to it under the exclusive license, Gensetix paid hundreds of thousands of dollars and actively supported research and

8

clinical trials.

**C.  Diakonos Research tries to buy Gensetix's license, fails and knowingly uses the inventions without authorization.**

21.     Dr. Decker left MD Anderson to work for Baylor College of Medicine.

22.     By 2015, Dr. Decker had built a relationship with a new source of funding, Diakonos Research, Ltd. A meeting was set up with representatives from Diakonos, Gensetix and MD Anderson to convince Gensetix to sell its license for little money. Those efforts failed. Later, Gensetix received a letter of intent signaling an offer of $100,000,000 commencing with an initial payment of $25,000,000 in exchange for control of and 85% equity in Gensetix. Gensetix was unable to take this offer because of the actions of UT and MD Anderson.

23.     Diakonos and Baylor College of Medicine began flagrantly using the inventions and Gensetix sought cooperation from UT and MD Anderson to protect the property rights. UT and MD Anderson refused and actively worked against Gensetix.

24.     The reason for MD Anderson and UT's refusal is clear in light of Diakonos' payoff of UT and MD Anderson. In January 2017, Diakonos announced to the press that Diakonos Research was giving UT and MD Anderson $1.63 million to "underwrite expenses related to University of Texas MD Anderson Cancer Center royalties, intellectual property prosecution, clinical data management, U.S. Food and Drug Administration (FDA) regulatory filings, management salaries, phase 1 manufacturing activities, and for general corporate expenses." Exhibit A. Diakonos gave UT and MD Anderson a slush fund to spend on operations, management salaries and corporate expenses. Diakonos and Baylor College of Medicine also cut MD Anderson and UT in on the clinical trials.

**D.  Gensetix sues Baylor College of Medicine because it was infringing the exclusive license, but UT and MD Anderson engage in side dealing with Diakonos and Baylor College of**

9

**Medicine and, to facilitate those side deals, sabotage Gensetix's patent litigation.**

25. The terms of UT's exclusive license agreement with Gensetix prohibited UT or its affiliates (MD Anderson) from interfering with Gensetix's right to enforce its patents, but that did not deter UT or MD Anderson from their pattern of interference and misconduct.

26. In 2016, 2017, 2018, and 2019, Gensetix complied with its obligations under the exclusive license agreement. In all years and in 2020, Gensetix confirmed that it had been in compliance and secured efforts to further commercialize by asserting the patent claim against Baylor and Dr. Decker.

27. During that same timeframe, UT (through MD Anderson) and Baylor College of Medicine (through Dr. Decker) negotiated a deal covering so-called "improvements" being developed by Dr. Decker that required a "freedom to operate" that he did not have because those rights belonged to Gensetix.

28. Instead of dealing with Gensetix, as UT and MD Anderson were contractually obligated to do, UT and MD Anderson cut Gensetix out of the negotiations and negotiated a side deal with Diakonos and Baylor College of Medicine.

29. UT's and MD Anderson's conduct and side deal with Baylor College of Medicine were particularly egregious, because in 2017-2019, they had been duplicitously inducing Gensetix to continue performing its onerous contractual obligations under the exclusive patent license with no true intention of honoring its terms in the future.

30. In April 2017, Gensetix sued Baylor College of Medicine for patent infringement.

31. During the patent litigation, UT and MD Anderson worked at every turn to thwart Gensetix's required enforcement of its rights, and deliberately worked with Baylor College of Medicine to deprive Gensetix of its property right to enforce the patents and recover damages for

10

104

infringement.

32. In May 2020, in the context of an ongoing dispute regarding UT's obligation to cooperate with Gensetix' enforcement of the patents, UT informed Gensetix that it would be terminating the exclusive license.

33. To make matters worse, and in an apparent effort to permanently impair Gensetix's right to enforce the patents for which it had purchased the exclusive right to enforce, UT conveyed the patents to Baylor College of Medicine in 2021.

34. Due to UT's and MD Anderson's conscience-shocking betrayal, Gensetix was required to dismiss its patent infringement suit against Baylor College of Medicine with no recovery and it received no royalty payments covering the period ending in 2020 during which Baylor College of Medicine was infringing and Gensetix was the exclusive licensee.

35. UT's and MD Anderson's egregious misconduct has robbed Gensetix of its property and the benefit of its payments to UT and MD Anderson, and funding of research and clinical trials.

## IX. CAUSES OF ACTION

36. Pursuant to Tex. R. Civ. P. 48, Gensetix pleadings in the following causes of action in the alternative to the extent there is any conflict.

### A. TAKINGS BY UT AND MD ANDERSON

37. The preceding paragraphs are incorporated herein.

38. Gensetix in May 2020 had vested property consisting of an exclusive patent license to—tantamount to an assignment of—U.S. Patent Nos. 8,728,806 ("'806 Patent") and 9,333,248 ("'248 Patent").

39. UT and MD Anderson, in or about May 2020, intentionally engaged in affirmative

11

conduct affecting the exclusive patent license.

40. In or about May 2020, the exclusive patent license belonging to Gensetix was effectively destroyed due to the affirmative conduct of UT and MD Anderson.

41. In or about February 2021, UT and MD Anderson sold the '806 and '248 Patents to Baylor College of Medicine.

42. Gensetix did not consent to the affirmative conduct of UT and MD Anderson nor did Gensetix consent to the destruction of its exclusive patent license or the sale of its property to Baylor College of Medicine.

43. The highest and best use of Gensetix' exclusive patent license would have been to convey a controlling interest in those rights to a willing offeror who made an unsolicited offer to Gensetix of $100,000,000 in exchange for rights that Gensetix was entitled to convey.

44. Just compensation for the nonconsensual destruction of the exclusive patent license that Gensetix would be at least $100,000,000 plus interest.

## B. BREACH OF CONTRACT BY UT AND MD ANDERSON

45. The preceding paragraphs are incorporated herein.

46. The parties entered into multiple agreements including the Patent and Technology License Agreement and Assignment.

47. Section 7.1 of the License Agreement required that Gensetix must enforce any patent exclusively licensed hereunder against infringement by third parties. Gensetix attempted to do so, but UT and MD Anderson interfered by reacting to Gensetix's complaint including them as a nominal plaintiff, and instead sought to dismiss the complaint against the very defendants that infringed the intellectual property rights which UT licensed exclusively to Gensetix. UT materially breached this section of the agreement and frustrated the purpose of the agreement.

48. Pursuant to Section 7.2 of the License Agreement, UT and MD Anderson were

12

106

required in any lawsuit to "cooperate fully with each other." UT and MD Anderson took affirmative steps to block the litigation, including but not limited to refusing to join the litigation despite their necessary party status, which materially violated this provision and frustrated the purpose of the agreement.

49.     Under Section 7.2 of the License Agreement, UT and MD Anderson were required to "permit access during regular business hours, to all relevant personnel, records, papers, information, samples, specimens, and the like in its possession." Yet, when Gensetix asked for UT and MD Anderson's compliance, they attempted to bill Gensetix for providing this information, as if Gensetix were a third party issuing a subpoena rather than a party contractually entitled to receive the information within the scope of Section 7.2. UT and MD Anderson never did provide access to any of the required information, and therefore materially violated this provision.

50.     Section 4.1(c) of the License Agreement limits the annual maintenance fees at and after the "sixth anniversary of the Effective Date and every anniversary of the Effective Date occurring thereafter until the first Sale." UT and MD Anderson insisted upon annual $50,000 payments—indeed, these $50,000 payments were the basis of UT's and MD Anderson's allegation that Gensetix purportedly breached—even though there had been a first "Sale" as defined under the agreement. Upon information and belief, based on the clinical trial published information, the costs of the study drugs were paid by the entities running the clinical trial, and therefore, meet the "transfer or disposition of a Licensed Product for value" definition of "Sale." Gensetix filed suit to confirm the sales proceeds and commercialization, but UT's and MD Anderson's breach and interference prevented Gensetix from providing further information. UT and MD Anderson materially breached this provision and frustrated the purpose of the agreement by continuing to seek maintenance fees.

51.     Gensetix was damaged as a result of UT and MD Anderson's breaches for which

13

it seeks damages.

<div align="center">**PRAYER**</div>

Gensetix requests that it recover just compensation, damages, attorneys' fees, pre-judgment and post judgment interest, exemplary damages, and costs of this proceeding, and that it receive any other relief to which it may show itself entitled.

Respectfully submitted,

**THE BUZBEE LAW FIRM**

By: /s/ *Anthony G. Buzbee*
Anthony G. Buzbee
State Bar No. 24001820
Ryan S. Pigg
State Bar No. 24088227
tbuzbee@txattorneys.com
rpigg@txattorneys.com
713-223-5393

**CONNOR LEE & SHUMAKER PLLC**

609 Castle Ridge Road, Suite 450
Austin, Texas 78746
512.777.1254 (main)
888.387.1134 (fax)
Cabrach J. Connor
State Bar No. 24036390
Cab@CLandS.com
Jennifer Tatum Lee
State Bar No. 24046950
Jennifer@CLandS.com
Sergio R. Davila
State Bar No. 24079795
Sergio@CLandS.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 28, 2021, a copy of the foregoing instrument was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

Locke Lord LLP

Davie E. Harrell, Jr.
Deanna Markowitz Willson
Monika A. Dziemianczuk

dharrell@lockelord.com
deanna.willson@lockelord.com
monika.dziemianczuk@lockelord.com

600 Travis Street, Suite 2800
Houston, Texas 77002

Tel. 713-226-1138
Fax 713-229-2633

Office of the Attorney General

H. Melissa Mather
Alyssa Bixby-Lawson

Melissa.Mather@oag.texas.gov
Alyssa.Bixby-Lawson@oag.texas.gov

300 West Fifteenth Street
Austin, Texas 78701

Tel. 512-475-2540
Tel. 512-475-4075
Fax 512-477-2348

*/s/ Anthony G. Buzbee*

15

109

Appendix Tab 4

Notice of Termination (2SuppCR, forthcoming)

# Exhibit 7

Certified Document Number: 99263938 - Page 1 of 2



THE UNIVERSITY OF TEXAS

MD Anderson
~~Cancer~~ Center

Making Cancer History®

May 20, 2020

Prepaid, First Class, Certified Mail – Return Receipt Requested
Via email to rita@mousamarketing.com
Gensetix, Inc.
3119 Mountain Oak Court
Houston, Texas 77068
Attention: Rita Mousa

> Re: Patent and Technology License Agreement as amended by Amendment No. 1 to the Patent and Technology License Agreement (the "PTLA") by and between The Board of Regents (the "Board") of the University of Texas System ("System"), on behalf of The University of Texas M. D. Anderson Cancer Center ("UTMDACC")(in addition, the Board and UTMDACC may hereinafter be collectively referred to as "UTMDACC"), and Gensetix, Inc. ("Gensetix")

Dear Rita,

This letter is written to memorialize that Gensetix has failed to cure its breach of Section 4.1(c)(6) of the PTLA, in particular failing to pay UTMDACC the outstanding █████ payment within the 60 calendar day cure period set forth in my March 9, 2020 letter.  Accordingly, the PTLA is terminated in its entirety.  UTMDACC reminds Gensetix of its surviving obligations under Section 13.4.

UTMDACC also reserves all rights and remedies in connection with the PTLA, including with respect to any other defaults under the PTLA.

A courtesy copy is being sent via email to Gensetix's counsel, Mr. Imron Aly.

Sincerely,

DocuSigned by:

Andrew P. Dennis



cc: Imron Aly, Esquire (via email) (IAly@schiffhardin.com)



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this  June 9, 2025

Certified Document Number:        99263938 Total Pages:  2

*Marilyn Burgess*

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christopher Dove on behalf of Christopher Dove
Bar No. 24032138
cdove@lockelord.com
Envelope ID: 101784597
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellants
Status as of 6/9/2025 1:56 PM CST

Associated Case Party: Board of Regents of the University of Texas System

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David E.Harrell | | David.Harrell@troutman.com | 6/9/2025 1:42:29 PM | SENT |
| Deanna MarkowitzWillson | | deanna.willson@troutman.com | 6/9/2025 1:42:29 PM | SENT |
| Chris Dove | | Chris.Dove@troutman.com | 6/9/2025 1:42:29 PM | SENT |
| Monika Dziemianczuk | | monika.dziemianczuk@troutman.com | 6/9/2025 1:42:29 PM | SENT |

Associated Case Party: University of Texas M.D. Anderson Cancer Center

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Terri Abernathy | | terri.abernathy@oag.texas.gov | 6/9/2025 1:42:29 PM | SENT |
| Quennette Rose | | Quennette.Rose@oag.texas.gov | 6/9/2025 1:42:29 PM | SENT |

Associated Case Party: Gensetix, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Cabrach Connor | | Cab@CLandS.com | 6/9/2025 1:42:29 PM | SENT |
| Jennifer TatumLee | | Jennifer@CLandS.com | 6/9/2025 1:42:29 PM | SENT |
| Sergio Davila | | Sergio@CLandS.com | 6/9/2025 1:42:29 PM | SENT |
| Anthony Buzbee | | tbuzbee@txattorneys.com | 6/9/2025 1:42:29 PM | SENT |
| Ryan Pigg | | rpigg@txattorneys.com | 6/9/2025 1:42:29 PM | SENT |
| Rian Taff | | rtaff@txattorneys.com | 6/9/2025 1:42:29 PM | SENT |
| Mauricio Guevara | | mguevara@txattorneys.com | 6/9/2025 1:42:29 PM | SENT |
| Lionel Sims | | lsims@txattorneys.com | 6/9/2025 1:42:29 PM | SENT |